PROFESSIONAL REAL ESTATE INVESTORS, INC., ET AL. *v.* COLUMBIA PICTURES INDUSTRIES, INC., ET AL.

No. 91–1043.   Argued November 2, 1992—Decided May 3, 1993

50

*Patrick J. Coyne* argued the cause for petitioners. With him on the briefs was *James R. Loftis III.*

*Andrew J. Pincus* argued the cause for respondents. With him on the brief were *Richard J. Favretto, Roy T. Englert, Jr.,* and *Stephen A. Kroft.* *

JUSTICE THOMAS delivered the opinion of the Court.

This case requires us to define the "sham" exception to the doctrine of antitrust immunity first identified in *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961), as that doctrine applies in the litigation context. Under the sham exception, activity "ostensibly directed toward influencing governmental action" does not qualify for *Noerr* immunity if it "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Id.,* at 144. We hold that litigation cannot be deprived of immunity as a sham unless the litigation is objectively baseless. The Court of Appeals for the Ninth Circuit refused to characterize as sham a lawsuit that the antitrust defendant admittedly had probable cause to institute. We affirm.

I

Petitioners Professional Real Estate Investors, Inc., and Kenneth F. Irwin (collectively, PRE) operated La Mancha Private Club and Villas, a resort hotel in Palm Springs, California. Having installed videodisc players in the resort's hotel rooms and assembled a library of more than 200 motion picture titles, PRE rented videodiscs to guests for in-room

---

*Solicitor General Starr, Acting Assistant Attorney General James, Deputy Solicitor General Wallace, Michael R. Dreeben, Catherine G. O'Sullivan,* and *James M. Spears* filed a brief for the United States as *amicus curiae* urging affirmance.

viewing. PRE also sought to develop a market for the sale of videodisc players to other hotels wishing to offer in-room viewing of prerecorded material. Respondents, Columbia Pictures Industries, Inc., and seven other major motion picture studios (collectively, Columbia), held copyrights to the motion pictures recorded on the videodiscs that PRE purchased. Columbia also licensed the transmission of copyrighted motion pictures to hotel rooms through a wired cable system called Spectradyne. PRE therefore competed with Columbia not only for the viewing market at La Mancha but also for the broader market for in-room entertainment services in hotels.

In 1983, Columbia sued PRE for alleged copyright infringement through the rental of videodiscs for viewing in hotel rooms. PRE counterclaimed, charging Columbia with violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1–2,[1] and various state-law infractions. In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade.

The parties filed cross-motions for summary judgment on Columbia's copyright claim and postponed further discovery on PRE's antitrust counterclaims. Columbia did not dispute that PRE could freely sell or lease lawfully purchased videodiscs under the Copyright Act's "first sale" doctrine, see 17 U. S. C. § 109(a), and PRE conceded that the playing of videodiscs constituted "performance" of motion pictures, see 17 U. S. C. § 101 (1988 ed. and Supp. III). As a result, summary judgment depended solely on whether rental of videodiscs for in-room viewing infringed Columbia's exclusive right to

---

[1] Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U. S. C. § 1. Section 2 punishes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

"perform the copyrighted work[s] publicly." § 106(4). Ruling that such rental did not constitute public performance, the District Court entered summary judgment for PRE. 228 USPQ 743 (CD Cal. 1986). The Court of Appeals affirmed on the grounds that a hotel room was not a "public place" and that PRE did not "transmit or otherwise communicate" Columbia's motion pictures. 866 F. 2d 278 (CA9 1989). See 17 U. S. C. § 101 (1988 ed. and Supp. III).

On remand, Columbia sought summary judgment on PRE's antitrust claims, arguing that the original copyright infringement action was no sham and was therefore entitled to immunity under *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc., supra.* Reasoning that the infringement action "was clearly a legitimate effort and therefore not a sham," 1990–1 Trade Cases ¶ 68,971, p. 63,242 (CD Cal. 1990), the District Court granted the motion:

> "It was clear from the manner in which the case was presented that [Columbia was] seeking and expecting a favorable judgment. Although I decided against [Columbia], the case was far from easy to resolve, and it was evident from the opinion affirming my order that the Court of Appeals had trouble with it as well. I find that there was probable cause for bringing the action, regardless of whether the issue was considered a question of fact or of law." *Id.,* at 63,243.

The court then denied PRE's request for further discovery on Columbia's intent in bringing the copyright action and dismissed PRE's state-law counterclaims without prejudice.

The Court of Appeals affirmed. 944 F. 2d 1525 (CA9 1991). After rejecting PRE's other allegations of anticompetitive conduct, see *id.,* at 1528–1529,[2] the court focused on

---

[2] The Court of Appeals held that Columbia's alleged refusal to grant copyright licenses was not "separate and distinct" from the prosecution of its infringement suit. 944 F. 2d, at 1528. The court also held that PRE had failed to establish how it could have suffered antitrust injury from

PRE's contention that the copyright action was indeed sham and that Columbia could not claim *Noerr* immunity. The Court of Appeals characterized "sham" litigation as one of two types of "abuse of . . . judicial processes": either "'misrepresentations . . . in the adjudicatory process'" or the pursuit of "'a pattern of baseless, repetitive claims'" instituted "'without probable cause, and regardless of the merits.'" 944 F. 2d, at 1529 (quoting *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 513, 512 (1972)). PRE neither "allege[d] that the [copyright] lawsuit involved misrepresentations" nor "challenge[d] the district court's finding that the infringement action was brought with probable cause, i. e., that the suit was not baseless." 944 F. 2d, at 1530. Rather, PRE opposed summary judgment solely by arguing that "the copyright infringement lawsuit [was] a sham because [Columbia] did not honestly believe that the infringement claim was meritorious." *Ibid.*

The Court of Appeals rejected PRE's contention that "subjective intent in bringing the suit was a question of fact precluding entry of summary judgment." *Ibid.* Instead, the court reasoned that the existence of probable cause "preclude[d] the application of the sham exception as a matter of law" because "a suit brought with probable cause does not fall within the sham exception to the *Noerr-Pennington* doctrine." *Id.*, at 1531, 1532. Finally, the court observed that PRE's failure to show that "the copyright infringement action was baseless" rendered irrelevant any "evidence of [Columbia's] subjective intent." *Id.*, at 1533. It accordingly rejected PRE's request for further discovery on Columbia's intent.

---

Columbia's other allegedly anticompetitive acts. *Id.*, at 1529. Thus, whatever antitrust injury Columbia inflicted must have stemmed from the attempted enforcement of copyrights, and we do not consider whether Columbia could have made a valid claim of immunity for anticompetitive conduct independent of petitioning activity. Cf. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 707–708 (1962).

The Courts of Appeals have defined "sham" in inconsistent and contradictory ways.[3] We once observed that "sham" might become "no more than a label courts could apply to activity they deem unworthy of antitrust immunity." *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U. S. 492, 508, n. 10 (1988). The array of definitions adopted by lower courts demonstrates that this observation was prescient.

## II

PRE contends that "the Ninth Circuit erred in holding that an antitrust plaintiff must, as a threshold prerequisite

---

[3] Several Courts of Appeals demand that an alleged sham be proved legally unreasonable. See *McGuire Oil Co.* v. *Mapco, Inc.*, 958 F. 2d 1552, 1560, and n. 12 (CA11 1992); *Litton Systems, Inc.* v. *American Telephone & Telegraph Co.*, 700 F. 2d 785, 809–812 (CA2 1983), cert. denied, 464 U. S. 1073 (1984); *Hydro-Tech Corp.* v. *Sundstrand Corp.*, 673 F. 2d 1171, 1177 (CA10 1982); *Federal Prescription Service, Inc.* v. *American Pharmaceutical Assn.*, 214 U. S. App. D. C. 76, 85, 89, 663 F. 2d 253, 262, 266 (1981), cert. denied, 455 U. S. 928 (1982). Still other courts have held that successful litigation by definition cannot be sham. See, *e. g.*, *Eden Hannon & Co.* v. *Sumitomo Trust & Banking Co.*, 914 F. 2d 556, 564–565 (CA4 1990), cert. denied, 499 U. S. 947 (1991); *South Dakota* v. *Kansas City Southern Industries, Inc.*, 880 F. 2d 40, 54 (CA8 1989), cert. denied *sub nom. South Dakota* v. *Kansas City Southern R. Co.*, 493 U. S. 1023 (1990); *Columbia Pictures Industries, Inc.* v. *Redd Horne, Inc.*, 749 F. 2d 154, 161 (CA3 1984).

Other Courts of Appeals would regard some meritorious litigation as sham. The Sixth Circuit treats "genuine [legal] substance" as raising merely "a *rebuttable* presumption" of immunity. *Westmac, Inc.* v. *Smith*, 797 F. 2d 313, 318 (1986) (emphasis added), cert. denied, 479 U. S. 1035 (1987). The Seventh Circuit denies immunity for the pursuit of valid claims if "the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation." *Grip-Pak, Inc.* v. *Illinois Tool Works, Inc.*, 694 F. 2d 466, 472 (1982), cert. denied, 461 U. S. 958 (1983). Finally, in the Fifth Circuit, "success on the merits does not . . . preclude" proof of a sham if the litigation was not "significantly motivated by a genuine desire for judicial relief." *In re Burlington Northern, Inc.*, 822 F. 2d 518, 528 (1987), cert. denied *sub nom. Union Pacific R. Co.* v. *Energy Transportation Systems, Inc.*, 484 U. S. 1007 (1988).

. . . , establish that a sham lawsuit is baseless as a matter of law." Brief for Petitioners 14. It invites us to adopt an approach under which either "indifference to . . . outcome," *ibid.*, or failure to prove that a petition for redress of grievances "would . . . have been brought but for [a] predatory motive," Tr. of Oral Arg. 10, would expose a defendant to antitrust liability under the sham exception. We decline PRE's invitation.

Those who petition government for redress are generally immune from antitrust liability. We first recognized in *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961), that "the Sherman Act does not prohibit . . . persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.*, at 136. Accord, *Mine Workers* v. *Pennington*, 381 U. S. 657, 669 (1965). In light of the government's "power to act in [its] representative capacity" and "to take actions . . . that operate to restrain trade," we reasoned that the Sherman Act does not punish "political activity" through which "the people . . . freely inform the government of their wishes." *Noerr*, 365 U. S., at 137. Nor did we "impute to Congress an intent to invade" the First Amendment right to petition. *Id.*, at 138.

*Noerr*, however, withheld immunity from "sham" activities because "application of the Sherman Act would be justified" when petitioning activity, "ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Id.*, at 144. In *Noerr* itself, we found that a publicity campaign by railroads seeking legislation harmful to truckers was no sham in that the "effort to influence legislation" was "not only genuine but also highly successful." *Ibid.*

In *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508 (1972), we elaborated on *Noerr* in two rele-

vant respects. First, we extended *Noerr* to "the approach of citizens ... to administrative agencies ... and to courts." 404 U. S., at 510. Second, we held that the complaint showed a sham not entitled to immunity when it contained allegations that one group of highway carriers "sought to bar ... competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process" by "institut[ing] ... proceedings and actions ... with or without probable cause, and regardless of the merits of the cases." *Id.*, at 512 (internal quotation marks omitted). We left unresolved the question presented by this case—whether litigation may be sham merely because a subjective expectation of success does not motivate the litigant. We now answer this question in the negative and hold that an objectively reasonable effort to litigate cannot be sham regardless of subjective intent.[4]

Our original formulation of antitrust petitioning immunity required that unprotected activity lack objective reasonableness. *Noerr* rejected the contention that an attempt "to influence the passage and enforcement of laws" might lose immunity merely because the lobbyists' "sole purpose ... was to destroy [their] competitors." 365 U. S., at 138. Nor were we persuaded by a showing that a publicity campaign "was intended to and did in fact injure [competitors] in their relationships with the public and with their customers," since such "direct injury" was merely "an incidental effect of the ... campaign to influence governmental action." *Id.*, at 143.

---

[4] *California Motor Transport* did refer to the antitrust defendants' "purpose to deprive ... competitors of meaningful access to the ... courts." 404 U. S., at 512. See also *id.*, at 515 (noting a "purpose to eliminate ... a competitor by denying him free and meaningful access to the agencies and courts"); *id.*, at 518 (Stewart, J., concurring in judgment) (agreeing that the antitrust laws could punish acts intended "to discourage and ultimately to prevent [a competitor] from invoking" administrative and judicial process). That a sham depends on the existence of anticompetitive intent, however, does not transform the sham inquiry into a purely subjective investigation.

We reasoned that "[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so." *Id.*, at 139. In short, "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Pennington*, 381 U. S., at 670.

Nothing in *California Motor Transport* retreated from these principles. Indeed, we recognized that recourse to agencies and courts should not be condemned as sham until a reviewing court has "discern[ed] and draw[n]" the "difficult line" separating objectively reasonable claims from "a pattern of baseless, repetitive claims . . . which leads the factfinder to conclude that the administrative and judicial processes have been abused." 404 U. S., at 513. Our recognition of a sham in that case signifies that the institution of legal proceedings "without probable cause" will give rise to a sham if such activity effectively "bar[s] . . . competitors from meaningful access to adjudicatory tribunals and so . . . usurp[s] th[e] decisionmaking process." *Id.*, at 512.

Since *California Motor Transport*, we have consistently assumed that the sham exception contains an indispensable objective component. We have described a sham as "evidenced by repetitive lawsuits carrying the hallmark of *insubstantial* claims." *Otter Tail Power Co. v. United States*, 410 U. S. 366, 380 (1973) (emphasis added). We regard as sham "private action that is not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U. S., at 500, n. 4. And we have explicitly observed that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham." *Id.*, at 502. See also *Vendo Co. v. Lektro-Vend Corp.*, 433 U. S. 623, 645 (1977) (BLACKMUN, J., concurring in result) (describing a successful lawsuit as a "genuine attemp[t] to use the . . . adjudicative process legitimately"

rather than "'a pattern of baseless, repetitive claims'"). Whether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham. See, *e. g., FTC* v. *Superior Court Trial Lawyers Assn.,* 493 U. S. 411, 424 (1990); *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 913–914 (1982). Cf. *Vendo, supra,* at 635–636, n. 6, 639, n. 9 (plurality opinion of REHNQUIST, J.); *id.,* at 644, n., 645 (BLACKMUN, J., concurring in result). Indeed, by analogy to *Noerr*'s sham exception, we held that even an "improperly motivated" lawsuit may not be enjoined under the National Labor Relations Act as an unfair labor practice unless such litigation is "baseless." *Bill Johnson's Restaurants, Inc.* v. *NLRB,* 461 U. S. 731, 743–744 (1983). Our decisions therefore establish that the legality of objectively reasonable petitioning "directed toward obtaining governmental action" is "not at all affected by any anticompetitive purpose [the actor] may have had." *Noerr,* 365 U. S., at 140, quoted in *Pennington, supra,* at 669.

Our most recent applications of *Noerr* immunity further demonstrate that neither *Noerr* immunity nor its sham exception turns on subjective intent alone. In *Allied Tube, supra,* at 503, and *FTC* v. *Trial Lawyers, supra,* at 424, 427, and n. 11, we refused to let antitrust defendants immunize otherwise unlawful restraints of trade by pleading a subjective intent to seek favorable legislation or to influence governmental action. Cf. *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.,* 468 U. S. 85, 101, n. 23 (1984) ("[G]ood motives will not validate an otherwise anticompetitive practice"). In *Columbia* v. *Omni Outdoor Advertising, Inc.,* 499 U. S. 365 (1991), we similarly held that challenges to allegedly sham petitioning activity must be resolved according to objective criteria. We dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's "purposes were to delay [the

plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate . . . administrative and legislative fora." *Id.*, at 381 (internal quotation marks omitted). We reasoned that such inimical intent "may render the manner of lobbying improper or even unlawful, but does not necessarily render it a 'sham.'" *Ibid.* Accord, *id.*, at 398 (STEVENS, J., dissenting).

In sum, fidelity to precedent compels us to reject a purely subjective definition of "sham." The sham exception so construed would undermine, if not vitiate, *Noerr.* And despite whatever "superficial certainty" it might provide, a subjective standard would utterly fail to supply "real 'intelligible guidance.'" *Allied Tube, supra,* at 508, n. 10.

## III

We now outline a two-part definition of "sham" litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail.[5] Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to inter-

---

[5] A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham. On the other hand, when the antitrust defendant has lost the underlying litigation, a court must "resist the understandable temptation to engage in *post hoc* reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation." *Christiansburg Garment Co.* v. *EEOC,* 434 U. S. 412, 421–422 (1978). Accord, *Hughes* v. *Rowe,* 449 U. S. 5, 14–15 (1980) *(per curiam).* The court must remember that "[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Christiansburg, supra,* at 422.

fere *directly* with the business relationships of a competitor," *Noerr, supra,* at 144 (emphasis added), through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," *Omni,* 499 U. S., at 380 (emphasis in original). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability. Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

Some of the apparent confusion over the meaning of "sham" may stem from our use of the word "genuine" to denote the opposite of "sham." See *Omni, supra,* at 382; *Allied Tube,* 486 U. S., at 500, n. 4; *Noerr, supra,* at 144; *Vendo Co.* v. *Lektro-Vend Corp., supra,* at 645 (BLACKMUN, J., concurring in result). The word "genuine" has both objective and subjective connotations. On one hand, "genuine" means "actually having the reputed or apparent qualities or character." Webster's Third New International Dictionary 948 (1986). "Genuine" in this sense governs Federal Rule of Civil Procedure 56, under which a "genuine issue" is one "that properly can be resolved only by a finder of fact because [it] may *reasonably* be resolved in favor of either party." *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 250 (1986) (emphasis added). On the other hand, "genuine" also means "sincerely and honestly felt or experienced." Webster's Dictionary, *supra,* at 948. To be sham, therefore, litigation must fail to be "genuine" in both senses of the word.[6]

---

[6] In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in sanctions" and that "[m]is-

## IV

We conclude that the Court of Appeals properly affirmed summary judgment for Columbia on PRE's antitrust counterclaim. Under the objective prong of the sham exception, the Court of Appeals correctly held that sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief. See 944 F. 2d, at 1529.

The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. The notion of probable cause, as understood and applied in the common-law tort of wrongful civil proceedings,[7] requires the plaintiff to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose. *Stewart* v. *Sonneborn*, 98 U. S. 187, 194 (1879); *Wyatt* v. *Cole*, 504 U. S. 158, 176 (1992) (REHNQUIST, C. J., dissenting); T. Cooley, Law of Torts *181. Cf. *Wheeler* v. *Nesbitt*, 24 How. 544, 549–550 (1861) (related tort for malicious prosecution of criminal charges). Probable cause to institute civil proceedings requires no more than a "reasonabl[e] belie[f] that there is a chance that [a] claim

---

representations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U. S., at 512–513. We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. Cf. Fed. Rule Civ. Proc. 60(b)(3) (allowing a federal court to "relieve a party . . . from a final judgment" for "fraud . . . , misrepresentation, or other misconduct of an adverse party"); *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172, 176–177 (1965); *id.*, at 179–180 (Harlan, J., concurring).

[7] This tort is frequently called "malicious prosecution," which (strictly speaking) governs the malicious pursuit of *criminal* proceedings without probable cause. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Torts § 120, p. 892 (5th ed. 1984). The threshold for showing probable cause is no higher in the civil context than in the criminal. See Restatement (Second) of Torts § 674, Comment *e*, pp. 454–455 (1977).

may be held valid upon adjudication" (internal quotation marks omitted). *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 262, 178 N. E. 2d 485, 488 (1961); Restatement (Second) of Torts § 675, Comment *e*, pp. 454–455 (1977). Because the absence of probable cause is an essential element of the tort, the existence of probable cause is an absolute defense. See *Crescent City Live Stock Co.* v. *Butchers' Union Slaughter-House Co.*, 120 U. S. 141, 149 (1887); *Wheeler, supra*, at 551; *Liberty Loan Corp. of Gadsden* v. *Mizell*, 410 So. 2d 45, 48 (Ala. 1982). Just as evidence of anticompetitive intent cannot affect the objective prong of *Noerr*'s sham exception, a showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the factfinder to infer the absence of probable cause. *Stewart, supra*, at 194; *Wheeler, supra*, at 551; 2 C. Addison, Law of Torts § 1, ¶ 853, pp. 67–68 (1876); T. Cooley, *supra*, at *184. When a court has found that an antitrust defendant claiming *Noerr* immunity had probable cause to sue, that finding compels the conclusion that a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit. Under our decision today, therefore, a proper probable-cause determination irrefutably demonstrates that an antitrust plaintiff has not proved the objective prong of the sham exception and that the defendant is accordingly entitled to *Noerr* immunity.

The District Court and the Court of Appeals correctly found that Columbia had probable cause to sue PRE for copyright infringement. Where, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law. · *Crescent, supra*, at 149; *Stewart, supra*, at 194; *Nelson* v. *Miller*, 227 Kan. 271, 277, 607 P. 2d 438, 444 (1980); *Stone* v. *Crocker*, 41 Mass. 81, 84–85 (1831); J. Bishop, Commentaries on Non-Contract Law § 240, p. 96 (1889). See also *Director General of Railroads* v. *Kastenbaum*, 263 U. S. 25, 28 (1923) ("The question is not whether [the defendant] thought the facts to

constitute probable cause, but whether the court thinks they did"). Columbia enjoyed the "exclusive righ[t] . . . to perform [its] copyrighted" motion pictures "publicly." 17 U. S. C. § 106(4). Regardless of whether it intended any monopolistic or predatory use, Columbia acquired this statutory right for motion pictures as "original" audiovisual "works of authorship fixed" in a "tangible medium of expression." § 102(a)(6). Indeed, to condition a copyright upon a demonstrated lack of anticompetitive intent would upset the notion of copyright as a "limited grant" of "monopoly privileges" intended simultaneously "to motivate the creative activity of authors" and "to give the public appropriate access to their work product." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 429 (1984).

When the District Court entered summary judgment for PRE on Columbia's copyright claim in 1986, it was by no means clear whether PRE's videodisc rental activities intruded on Columbia's copyrights. At that time, the Third Circuit and a District Court within the Third Circuit had held that the rental of video cassettes for viewing in on-site, private screening rooms infringed on the copyright owner's right of public performance. *Columbia Pictures Industries, Inc.* v. *Redd Horne, Inc.*, 749 F. 2d 154 (1984); *Columbia Pictures Industries, Inc.* v. *Aveco, Inc.*, 612 F. Supp. 315 (MD Pa. 1985), aff'd, 800 F. 2d 59 (1986). Although the District Court and the Ninth Circuit distinguished these decisions by reasoning that hotel rooms offered a degree of privacy more akin to the home than to a video rental store, see 228 USPQ, at 746; 866 F. 2d, at 280–281, copyright scholars criticized both the reasoning and the outcome of the Ninth Circuit's decision, see 1 P. Goldstein, Copyright: Principles, Law and Practice § 5.7.2.2, pp. 616–619 (1989); 2 M. Nimmer & D. Nimmer, Nimmer on Copyright § 8.14[C][3], pp. 8–168 to 8–173 (1992). The Seventh Circuit expressly "decline[d] to follow" the Ninth Circuit and adopted instead the Third Circuit's definition of a "public place." *Video*

*Views, Inc.* v. *Studio 21, Ltd.*, 925 F. 2d 1010, 1020, cert. denied, 502 U. S. 861 (1991). In light of the unsettled condition of the law, Columbia plainly had probable cause to sue.

Any reasonable copyright owner in Columbia's position could have believed that it had some chance of winning an infringement suit against PRE. Even though it did not survive PRE's motion for summary judgment, Columbia's copyright action was arguably "warranted by existing law" or at the very least was based on an objectively "good faith argument for the extension, modification, or reversal of existing law." Fed. Rule Civ. Proc. 11. By the time the Ninth Circuit had reviewed all claims in this litigation, it became apparent that Columbia might have won its copyright suit in either the Third or the Seventh Circuit. Even in the absence of supporting authority, Columbia would have been entitled to press a novel copyright claim as long as a similarly situated reasonable litigant could have perceived some likelihood of success. A court could reasonably conclude that Columbia's infringement action was an objectively plausible effort to enforce rights. Accordingly, we conclude that PRE failed to establish the objective prong of *Noerr*'s sham exception.

Finally, the Court of Appeals properly refused PRE's request for further discovery on the economic circumstances of the underlying copyright litigation. As we have held, PRE could not pierce Columbia's *Noerr* immunity without proof that Columbia's infringement action was objectively baseless or frivolous. Thus, the District Court had no occasion to inquire whether Columbia was indifferent to the outcome on the merits of the copyright suit, whether any damages for infringement would be too low to justify Columbia's investment in the suit, or whether Columbia had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process. Contra, *Grip-Pak, Inc.* v. *Illinois Tool Works, Inc.*, 694 F. 2d 466, 472 (CA7 1982), cert. denied, 461 U. S. 958 (1983). Such matters concern Colum-

bia's economic motivations in bringing suit, which were rendered irrelevant by the objective legal reasonableness of the litigation. The existence of probable cause eliminated any "genuine issue as to any material fact," Fed. Rule Civ. Proc. 56(c), and summary judgment properly issued.

We affirm the judgment of the Court of Appeals.

*So ordered.*

JUSTICE SOUTER, concurring.

The Court holds today that a person cannot incur antitrust liability merely by bringing a lawsuit as long as the suit is not "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Ante,* at 60. The Court assumes that the District Court and the Court of Appeals were finding this very test satisfied when they concluded that Columbia's suit against PRE for copyright infringement was supported by "probable cause," a standard which, as the Court explains it in this case, requires a "reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication." *Ante,* at 62–63 (internal quotation marks omitted). I agree that this term, so defined, is rightly read as expressing the same test that the Court announces today; the expectation of a reasonable litigant can be dubbed a "reasonable belief," and realistic expectation of success on the merits can be paraphrased as "a chance of being held valid upon adjudication."

Having established this identity of meaning, however, the Court proceeds to discuss the particular facts of this case, not in terms of its own formulation of objective baselessness, but in terms of "probable cause." Up to a point, this is understandable; the Court of Appeals used the term "probable cause" to represent objective reasonableness, and it seems natural to use the same term when reviewing that court's conclusions. Yet as the Court acknowledges, *ante,* at 63, since there is no dispute over the facts underlying the suit

at issue here, the question whether that suit was objectively baseless is purely one of law, which we are obliged to consider *de novo*. There is therefore no need to frame the question in the Court of Appeals's terms. Accordingly, I would prefer to put the question in our own terms, and to conclude simply that, on the undisputed facts and the law as it stood when Columbia filed its suit, a reasonable litigant could realistically have expected success on the merits.

My preference stems from a concern that other courts could read today's opinion as transplanting every substantive nuance and procedural quirk of the common-law tort of wrongful civil proceedings into federal antitrust law. I do not understand the Court to mean anything of the sort, however, any more than I understand its citation of Rule 11 of the Federal Rules of Civil Procedure, see *ante*, at 65, to signal the importation of every jot and tittle of the law of attorney sanctions. Rather, I take the Court's use of the term "probable cause" merely as shorthand for a reasonable litigant's realistic expectation of success on the merits, and on that understanding, I join the Court's opinion.

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

While I agree with the Court's disposition of this case and with its holding that "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent," *ante*, at 57, I write separately to disassociate myself from some of the unnecessarily broad dicta in the Court's opinion. Specifically, I disagree with the Court's equation of "objectively baseless" with the answer to the question whether any "reasonable litigant could realistically expect success on the merits."[1] There might well be lawsuits that fit the latter defi-

---

[1] *Ante*, at 60. See also *ante*, at 62: "[S]ham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief"; *ante*, at 60: "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable

nition but can be shown to be objectively *unreasonable*, and
thus shams. It might not be objectively reasonable to bring
a lawsuit just because some form of success on the merits—
no matter how insignificant—could be expected.[2] With that
possibility in mind, the Court should avoid an unnecessarily
broad holding that it might regret when confronted with a
more complicated case.

As the Court recently explained, a "sham" is the use of
"the governmental *process*—as opposed to the *outcome* of
that process—as an anticompetitive weapon." *Columbia* v.
*Omni Outdoor Advertising, Inc.*, 499 U. S. 365, 380 (1991).
The distinction between abusing the judicial process to re-
strain competition and prosecuting a lawsuit that, if success-
ful, will restrain competition must guide any court's decision
whether a particular filing, or series of filings, is a sham.
The label "sham" is appropriately applied to a case, or series
of cases, in which the plaintiff is indifferent to the outcome
of the litigation itself, but has nevertheless sought to impose
a collateral harm on the defendant by, for example, impairing
his credit, abusing the discovery process, or interfering with
his access to governmental agencies. It might also apply to
a plaintiff who had some reason to expect success on the
merits but because of its tremendous cost would not bother
to achieve that result without the benefit of collateral inju-

---

outcome, the suit is immunized under *Noerr* . . . ." But see *ante*, at 62:
"The existence of probable cause to institute legal proceedings precludes
a finding that an antitrust defendant has engaged in sham litigation."
And see *ante*, at 65: "Columbia's copyright action was arguably 'warranted
by existing law'" under the standards of Federal Rule of Civil Procedure
11. These varied restatements of the Court's new test make it unclear
whether it is willing to affirm the Court of Appeals by any of these stand-
ards individually, or by all of them together.

[2] The Court's recent decision in *Farrar* v. *Hobby*, 506 U. S. 103 (1992)
makes me wonder whether "10 years of litigation and two trips to the
Court of Appeals" to recover "one dollar from one defendant," *id.*, at 116
(O'CONNOR, J., concurring), would qualify as a reasonable expectation of
"favorable relief" under today's opinion.

ries imposed on its competitor by the legal process alone. Litigation filed or pursued for such collateral purposes is fundamentally different from a case in which the relief sought in the litigation itself would give the plaintiff a competitive advantage or, perhaps, exclude a potential competitor from entering a market with a product that either infringes the plaintiff's patent or copyright or violates an exclusive franchise granted by a governmental body.

The case before us today is in the latter, obviously legitimate, category. There was no unethical or other improper use of the judicial system; instead, respondents invoked the federal court's jurisdiction to determine whether they could lawfully restrain competition with petitioners. The relief they sought in their original action, if granted, would have had the anticompetitive consequences authorized by federal copyright law. Given that the original copyright infringement action was objectively reasonable—and the District Court, the Court of Appeals, and this Court all agree that it was—neither the respondents' own measure of their chances of success nor an alleged goal of harming petitioners provides a sufficient basis for treating it as a sham. We may presume that every litigant intends harm to his adversary; moreover, uncertainty about the possible resolution of unsettled questions of law is characteristic of the adversary process. Access to the courts is far too precious a right for us to infer wrongdoing from nothing more than using the judicial process to seek a competitive advantage in a doubtful case. Thus, the Court's disposition of this case is unquestionably correct.

I am persuaded, however, that all, or virtually all, of the Courts of Appeals that have reviewed similar claims (involving a single action seeking to enforce a property right) would have reached the same conclusion. To an unnecessary degree, therefore, the Court has set up a straw man to justify its elaboration of a two-part test describing all potential shams. Of the 10 cases cited by the Court as evidence of

widespread confusion about the scope of the "sham" exception to the doctrine of *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961), and *Mine Workers* v. *Pennington*, 381 U. S. 657 (1965), see *ante*, at 55, n. 3, 5 share three important characteristics with this case: The alleged injury to competition was defined by the prayer for relief in the antitrust defendant's original action; there was no unethical conduct or collateral harm "external to the litigation or to the result reached in the litigation";[3] and there had been no series of repetitive claims. Each of those courts concluded, as this Court does today, that allegations of subjective anticompetitive motivation do not make an otherwise reasonable lawsuit a sham.[4]

In each of the five other cases cited by the Court, the plaintiff alleged antitrust violations more extensive than the filing of a single anticompetitive lawsuit. In three of those cases the core of the alleged antitrust violation lay in the act of petitioning the government for relief: One involved the repetitive filing of baseless administrative claims,[5] another in-

---

[3] *Omni Resource Development Corp.* v. *Conoco, Inc.*, 739 F. 2d 1412, 1414 (CA9 1984) (Kennedy, J.).

[4] See *McGuire Oil Co.* v. *Mapco, Inc.*, 958 F. 2d 1552 (CA11 1992) (unsuccessful action to enjoin alleged violations of Alabama's Motor Fuel Marketing Act not a sham); *Hydro-Tech Corp.* v. *Sundstrand Corp.*, 673 F. 2d 1171 (CA10 1982) (unsuccessful action alleging misappropriation of trade secrets not a sham); *Eden Hannon & Co.* v. *Sumitomo Trust & Banking Co.*, 914 F. 2d 556 (CA4 1990) (successful action imposing constructive trust on profits derived from breach of nondisclosure agreement not a sham); *Columbia Pictures Industries, Inc.* v. *Redd Horne, Inc.*, 749 F. 2d 154 (CA3 1984) (successful copyright infringement not a sham); *South Dakota* v. *Kansas City Southern Industries, Inc.*, 880 F. 2d 40 (CA8 1989) (successful action to enjoin breach of contract not a sham; the court was careful to point out, however, that success does not "categorically preclude a finding of sham." *Id.*, at 54, n. 30).

[5] *Litton Systems, Inc.* v. *American Telephone & Telegraph Co.*, 700 F. 2d 785 (CA2 1983), cert. denied, 464 U. S. 1073 (1984). The Second Circuit found that AT&T's continued filing of administrative tariffs long after

volved extensive evidence of anticompetitive motivation behind the lawsuit that followed an elaborate and unsuccessful lobbying effort,[6] and in the third a collateral lawsuit was only one of the many ways in which the antitrust defendant had allegedly tried to put the plaintiff out of business.[7]   In each

those claims had become objectively unreasonable supported a jury's sham finding.   AT&T's anticompetitive actions were in fact so far removed from the act of petitioning the government for relief that Chief Judge Oakes and Judge Meskill also held, in reliance on *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690 (1962), and *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579 (1976) (plurality opinion), that tariff filings with the Federal Communications Commission were acts of private commercial activity in the marketplace rather than requests for governmental action, and thus were not even arguably protected by the *Noerr-Pennington* doctrine.   *Litton Systems*, 700 F. 2d, at 806–809.

[6] *Westmac, Inc.* v. *Smith*, 797 F. 2d 313 (CA6 1986), cert. denied, 479 U. S. 1035 (1987).   Although the Sixth Circuit did hold that the genuine substance of an anticompetitive lawsuit creates a rebuttable presumption of objective reasonableness, given the facts of that case—in which the antitrust plaintiff had presented strong evidence that the defendants' lawsuit, which followed a long and unsuccessful lobbying effort, had been motivated solely for the anticompetitive harm the judicial process would inflict on it—that modest reservation was probably wise.   Evidence of anticompetitive animus in *Westmac* was in fact so great that Chief Judge Merritt thought that the plaintiff *had* successfully rebutted the presumptive reasonableness of defendants' lawsuit.   The delay from the defendants' combined lobbying and litigation attack had allegedly sent the plaintiff into bankruptcy, and memos from one defendant to its attorney had stated, "'If this [lobbying activity] doesn't succeed, start a lawsuit—bonds won't sell,'" 797 F. 2d, at 318, and (in a statement repeated to a codefendant), "'if nothing else, we'll delay sale of the bonds,'" *id.*, at 322 (Merritt, C. J., dissenting) (emphasis omitted).   In any event, the Sixth Circuit rule—to the extent that it would apply in a case as simple as this one—would result in the same conclusion we reach here.

[7] *Federal Prescription Service, Inc.* v. *American Pharmaceutical Assn.*, 214 U. S. App. D. C. 76, 663 F. 2d 253 (1981), cert. denied, 455 U. S. 928 (1982).   In that case, the antitrust plaintiff alleged a 2-decade long conspiracy to lobby, boycott, and sue it (in state licensing boards, state legislatures, the marketplace, and both state and federal courts) out of existence.   In spite of those allegations, the Court of Appeals found that

of these cases the court showed appropriate deference to our opinions in *Noerr* and *Pennington,* in which we held that the act of petitioning the government (usually in the form of lobbying) deserves especially broad protection from antitrust liability. The Court can point to nothing in these three opinions that would require a different result here. The two remaining cases—in which the Courts of Appeals did state that a successful lawsuit could be a sham—did not involve lobbying, but did contain much broader and more complicated allegations than petitioners presented below.[8] Like the three opinions described above, these decisions should not be expected to offer guidance, nor be blamed for spawning confusion, in a case alleging that the filing of a single lawsuit violated the Sherman Act.

Even in this Court, more complicated cases, in which, for example, the alleged competitive injury has involved something more than the threat of an adverse outcome in a single

the defendant's actions, which primarily consisted in lobbying for the abolition of plaintiff's mail-order prescription business, were immune under *Noerr-Pennington.*

[8] In *Grip-Pak, Inc.* v. *Illinois Tool Works, Inc.,* 694 F. 2d 466 (1982) (Posner, J.), cert. denied, 461 U. S. 958 (1983), the antitrust defendant's alleged violations of several provisions of the Sherman and Clayton Acts included much more than the filing of a single lawsuit; they encompassed a broad scheme of monopolizing the entire relevant market by: purchasing patents; threatening to file many other, patently groundless lawsuits; acquiring a competitor; dividing markets; and filing a fraudulent patent application. In *In re Burlington Northern, Inc.,* 822 F. 2d 518 (CA5 1987), cert. denied, 484 U. S. 1007 (1988), the plaintiffs alleged, and produced evidence to support their theory, that the defendant had filed suit solely to cause them a delay of crippling expense, and the defendants had either brought or unsuccessfully defended a succession of related lawsuits involving plaintiff's right to compete. In both of these cases the Courts of Appeals ably attempted to balance strict enforcement of the antitrust laws with possible abuses of the judicial process. That they permitted some reliance on subjective motivation—as even we have done in cases alleging abuse of judicial process, see *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 513–518 (1972)—is neither surprising nor relevant in a case involving no such allegations.

lawsuit, have produced less definite rules. Repetitive filings, some of which are successful and some unsuccessful, may support an inference that the process is being misused. *California Motor Transport Co. v. Trucking Unlimited,* 404 U. S. 508 (1972). In such a case, a rule that a single meritorious action can never constitute a sham cannot be dispositive. Moreover, a simple rule may be hard to apply when there is evidence that the judicial process has been used as part of a larger program to control a market and to interfere with a potential competitor's financing without any interest in the outcome of the lawsuit itself, see *Otter Tail Power Co. v. United States,* 410 U. S. 366, 379, n. 9 (1973); *Westmac, Inc. v. Smith,* 797 F. 2d 313, 322 (CA6 1986) (Merritt, C. J., dissenting). It is in more complex cases that courts have required a more sophisticated analysis—one going beyond a mere evaluation of the merits of a single claim.

In one such case Judge Posner made the following observations about the subtle distinction between suing a competitor to get damages and filing a lawsuit only in the hope that the expense and burden of defending it will make the defendant abandon its competitive behavior:

> "But we are not prepared to rule that the difficulty of distinguishing lawful from unlawful purpose in litigation between competitors is so acute that such litigation can never be considered an actionable restraint of trade, provided it has some, though perhaps only threadbare, basis in law. Many claims not wholly groundless would never be sued on for their own sake; the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation. Suppose a monopolist brought a tort action against its single, tiny competitor; the action had a colorable basis in law; but in fact the monopolist would never have brought the suit—its chances of winning, or the damages it could hope to get if it did win, were too small compared to what it would have to spend on the litigation—except that it wanted to

use pretrial discovery to discover its competitor's trade secrets; or hoped that the competitor would be required to make public disclosure of its potential liability in the suit and that this disclosure would increase the interest rate that the competitor had to pay for bank financing; or just wanted to impose heavy legal costs on the competitor in the hope of deterring entry by other firms. In these examples the plaintiff wants to hurt a competitor not by getting a judgment against him, which would be a proper objective, but just by the maintenance of the suit, regardless of its outcome. See *City of Gainesville* v. *Florida Power & Light Co.*, 488 F. Supp. 1258, 1265–66 (S.D. Fla. 1980).

"Some students of antitrust law would regard all of our examples of anticompetitive litigation as fanciful, and in all the evidentiary problems of disentangling real from professed motives would be acute. Concern with the evidentiary problems may explain why some courts hold that a single lawsuit cannot provide a basis for an antitrust claim (see Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine*, 45 U. Chi. L. Rev. 80, 109–10 (1977))—an issue we need not face here since three improper lawsuits are alleged, and it can make no difference that they were not all against Grip-Pak. Still, we think it is premature to hold that litigation, unless malicious in the tort sense, can never be actionable under the antitrust laws. The existence of a tort of abuse of process shows that it has long been thought that litigation could be used for improper purposes even when there is probable cause for the litigation; and if the improper purpose is to use litigation as a tool for suppressing competition in its antitrust sense, see, e. g., *Products Liability Ins. Agency, Inc.* v. *Crum & Forster Ins. Cos.*, 682 F. 2d 660, 663–64 (7th Cir. 1982), it becomes a matter of antitrust concern. This is

not to say that litigation is actionable under the antitrust laws merely because the plaintiff is trying to get a monopoly. He is entitled to pursue such a goal through lawful means, including litigation against competitors. The line is crossed when his purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating. The difficulty of determining the true purpose is great but no more so than in many other areas of antitrust law." *Grip-Pak, Inc.* v. *Illinois Tool Works, Inc.*, 694 F. 2d 466, 472 (1982).

It is important to remember that the distinction between "sham" litigation and genuine litigation is not always, or only, the difference between lawful and unlawful conduct; objectively reasonable lawsuits may still break the law. For example, a manufacturer's successful action enforcing resale price maintenance agreements,[9] restrictive provisions in a license to use a patent or a trademark,[10] or an equipment lease,[11] may evidence, or even constitute, violations of the antitrust laws. On the other hand, just because a sham lawsuit has grievously harmed a competitor does not necessarily mean that it has violated the Sherman Act. See *Spectrum Sports, Inc.* v. *McQuillan*, 506 U. S. 447, 455–459 (1993). The rare plaintiff who successfully proves a sham must still satisfy the exacting elements of an antitrust demand. See *ante*, at 61.

In sum, in this case I agree with the Court's explanation of why respondents' copyright infringement action was not "objectively baseless," and why allegations of improper sub-

---

[9] *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911); *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951).

[10] *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593 (1951); *Farbenfabriken Bayer A. G.* v. *Sterling Drug, Inc.*, 307 F. 2d 207 (CA3 1962).

[11] *International Salt Co.* v. *United States*, 332 U. S. 392 (1947); *United Shoe Machinery Corp.* v. *United States*, 258 U. S. 451 (1922).

jective motivation do not make such a lawsuit a "sham."   I would not, however, use this easy case as a vehicle for announcing a rule that may govern the decision of difficult cases, some of which may involve abuse of the judicial process.   Accordingly, I concur in the Court's judgment but not in its opinion.