OPINION OF THE COURT
Louise Gruner Gans, J.
Defendants Daniel Engelstein and the law firm of Vladeck, *86 Waldman, Elias & Engelhard, P. C. (Vladeck, Waldman)[1] move to dismiss the complaint for failure to state a cause of action. (CPLR 3211 [a] [7].) Plaintiff Concourse Nursing Home (Concourse) cross-moves for an order compelling defendants to proceed with discovery. (CPLR 3124.).
«
FACTUAL BACKGROUND
This action arises from an earlier litigation which, in the words of the Federal Judge who handled it, was a “hotly contested and long outstanding” action. (See, Local 144, Hotel, Hosp., Nursing Home & Affiliated Servs. Union v C.N.H. Mgt. Assocs., 799 F Supp 1554 [SD NY 1992, Sweet, J.].) Defendant Vladeck, Waldman represented the plaintiff, Local 144. The defendants were C.N.H. Management Associates, Inc. and Marvin Neiman, the sole proprietor of Concourse. Concourse is a privately owned nursing home which relies on Federal Medicare and Medicaid reimbursements for 90% of its revenues. Concourse’s employees are represented by Local 144.
In 1987, a labor dispute arose between Local 144 and Concourse regarding Concourse’s payment of its employees. Local 144 commenced an action in Federal court, Local 144, Hotel, Hosp., Nursing Home & Affiliated Servs. Union v C.N.H. Mgt. Assocs., alleging that Neiman misappropriated Medicaid reimbursements that had been paid by the New York State Department of Health (DOH) for the express purpose of paying industry standard wages and benefits to Concourse employees represented by Local 144.
On October 9, 1989, after the lawsuit had been filed, Concourse and DOH entered into a letter agreement to resolve Concourse’s pending administrative appeals regarding the Medicaid rates used to determine reimbursements for providing nursing home services. DOH agreed: (1) to review Concourse’s outstanding rates as if Concourse had paid parity in full; (2) to provide Concourse with the opportunity to object to any proposed revisions in advance; and then (3) to pay on the basis of those rates, if there was a settlement with Local 144 under which the Medicaid reimbursements generated from the appeals would benefit Concourse’s employees. On May 11,1990, *87 DOH provided Neiman with proposed rate calculations; Neiman was given a number of extensions to file objections to the rate appeals, but failed to do so by the August 22, 1990 deadline.
The proposed rate calculations would have generated a gross amount of $8.7 million for the period through April 30, 1991, with a net cash payment in excess of $7.1 million. While the value of the rate appeals had been calculated, unrelated audits remained, which could have potentially reduced the amount of the net lump-sum payment.
In the spring of 1991, as the trial date approached, the parties entered into settlement negotiations. The negotiations required a “tri-party agreement” in that DOH would not make any payments to Concourse without a settlement of its parity dispute with Local 144, since the funds Concourse would use to make the payments on the settlement with Local 144 would come from DOH’s payments on the pending rate appeals. A settlement was reached on May'23, 1991, on the eve of trial, which provided for the parties to enter into a collective bargaining agreement and required Neiman to pay more than $7.5 million to Local 144 for distribution to Concourse employees represented by Local 144.
Unbeknownst to Local 144, Neiman had met with DOH in April 1991, at which time he informed the agency that there were errors in the Medicaid rate calculations, and that Concourse should receive an additional $3.3 million. Local 144 was never informed that DOH agreed to reimburse Concourse this additional amount.
Upon learning in early June 1991 that Concourse had sought and DOH had granted a $3.3 million enhancement of the reimbursement package prior to the settlement, Local 144 advised Concourse that it would both enforce the existing settlement and reserve its right to seek damages for fraud in the settlement process. On July 1, 1991, defendants Engelstein and Sillies met in Albany with Steven Anderman, a Deputy Director of DOH, to discuss DOH’s failure to inform Local 144 of the rate adjustments and to determine the basis of the additional amount to be paid to Concourse (the July 1st meeting).[2] At the July 1st meeting, DOH conceded its failure to advise Local 144 of the increase in the rate calculations before the *88 settlement had been reached. Following the July 1st meeting, DOH rescinded the additional reimbursement and informed Local 144 that it would reinstate the original rates upon which the settlement was negotiated. In addition, DOH requested that the State Department of Social Services (DSS) conduct an audit of Concourse’s 1983 labor cost accrual.
DOH paid Concourse $7,367 million in August 1991. Concourse then commenced an action in this court against DOH officials seeking payment of the additional $3.3 million; the court dismissed the action for lack of subject matter jurisdiction, on the ground that the Court of Claims was the exclusive forum for such a claim. (Concourse Nursing Home v Axelrod, Sup Ct, NY County, Oct. 31, 1997, Miller, J., index No. 24844/ 91.) Concourse’s appeal from that decision is pending.
The record in that case (of which this court may take judicial notice) includes an affidavit by Steven Anderman describing the July 1st meeting. According to Anderman, during the meeting defendants brought to the attention of DOH an apparent inconsistency in the labor costs claimed by plaintiff in its 1983 and 1984 reports. Anderman states that after investigation of those discrepancies, the Department determined that prudence required DOH to withhold payment of the additional $3.3 million pending further audit. Currently plaintiff reports that of the $3.3 million, only $1.1 million was found to be payable to plaintiff, and has been paid.
Neiman also sought to alter the distribution of the payments in connection with the settlement of the Federal court action, which was rejected by that court on October 4, 1991. After Neiman failed to comply with the terms of the settlement by making the second installment, Local 144 moved to hold Neiman in contempt for failure to comply with the settlement and Neiman cross-moved for relief from the settlement order. In a September 22, 1992 decision, the Federal court granted Local 144’s motion, held Neiman in contempt of the court’s prior order, and denied Neiman’s cross motion. (Local 144, Hotel, Hosp., Nursing Home & Affiliated Servs. Union v C.N.H. Mgt. Assocs., supra, 799 F Supp, at 1558.)
Plaintiff commenced the instant action in October 1994. The complaint alleges that by meeting with various officials of DOH, Vladeck, Waldman conspired with DOH officials in violation of 42 USC § 1983 and engaged in conduct constituting prima facie *89 tort and tortious interference with contractual relations. After removing the action to the United States District Court for the Southern District of New York, defendants moved for summary judgment. The District Court granted the motion with respect to the first cause of action only (the 42 USC § 1983 claim), declined to exercise supplemental jurisdiction over the State law claims, and remanded the matter to this court. (See, Concourse Nursing Home v Engelstein, 1997 WL 672015, 1997 US Dist LEXIS 16822 [SD NY, Oct. 29, 1997, Knapp, J.], and 1998 WL 288629, 1998 US Dist LEXIS 14792 [SD NY, June 2, 1998, Knapp, J.].)
DISCUSSION
- Defendants move to dismiss the four remaining State law causes of action in the complaint. The second cause of action alleges that defendants’ conduct constituted “wrongful interference with plaintiffs contractual relationships with DOH and DSS.” (Complaint [j 57.) The third cause of action alleges that defendants’ conduct constituted “wrongful inducement of a breach * * * 0f * * * contracts.” (Complaint 61.) The fourth cause of action alleges that defendants’ conduct constituted a “prima facie tort” (complaint ]} 66), and the fifth alleges “negligent interference with plaintiffs contractual relationships.” (Complaint H 69.)
Defendants seek dismissal based on their assertion that the First Amendment right to petition the government for redress of grievances protects lobbying efforts from business tort claims and entitles them to immunity from suit. Defendants rely on what is known as the Noerr-Pennington doctrine, which derives from two United States Supreme Court cases, Eastern R. R. Presidents Conference v Noerr Motor Frgt. (365 US 127, reh denied 365 US 875 [1961]) and United Mine Workers v Pennington (381 US 657 [1965]).
In Noerr (supra, 365 US, at 144), the Supreme Court held that a lobbying effort conducted by competing railroads for the purpose of obtaining legislation to destroy the competition that the railroads faced from truckers was immune from antitrust scrutiny under the First Amendment because “the railroads were making a genuine effort to influence legislation.” In Pennington {supra), the Court extended the doctrine to protect efforts to influence governmental action through administrative processes, holding that efforts between the United Mine Workers and large coal mine operators to persuade the Secretary of Labor to establish higher minimum wages for workers supply *90 ing coal was protected by the First Amendment and immune from the antitrust laws. The Supreme Court has repeatedly reaffirmed the doctrine, emphasizing that the right to petition extends to all branches of government and that “it would be destructive of rights of association and of petition to hold that groups with common interests may not * * * use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view.” (California Motor Transp. Co. v Trucking Unlimited, 404 US 508, 510-511 [1972].)
Under the Noerr-Pennington doctrine, defendants’ motives in meeting with DOH are irrelevant. (See, Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra, 365 US, at 139 [“The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so”]; see also, Professional Real Estate Investors v Columbia Pictures Indus., 508 US 49, 57 [1993] [“(A)n objectively reasonable effort to litigate cannot be sham regardless of subjective intent”]; City of Columbia v Omni Outdoor Adv., 499 US 365, 380 [1991] [“That a private party’s political motives are selfish is irrelevant”]; United Mine Workers v Pennington, supra, 381 US, at 670 [“Noerr shields * * * a concerted effort to influence public officials regardless of intent or purpose”].)
The only limitation on the Noerr-Pennington doctrine is referred to as the “sham exception”, which rejects the First Amendment protection where a defendant is using the petitioning process as a means of interference or harassment. (See, City of Columbia v Omni Outdoor Adv., supra, 499 US, at 380 [no immunity where “persons use the governmental process — as opposed to the outcome of that process — as a() * * * weapon”].) The “classic example” set forth in Omni is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license, but merely to impose expense and delay. (Supra; see also, Eastern R. R. Presidents Conference v Noerr Motor Frgt., supra, 365 US, at 144 [no immunity when petitioning activity “is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor”].)
Concourse, which rejects the applicability of the NoerrPennington doctrine to this case, does not address the sham exception. In any event, the sham exception is inapplicable *91 here, since defendants’ conduct in petitioning DOH was not an abuse of the governmental process. Additionally, defendants are not in competition with Concourse’s business, did not stand to profit financially from a reduction in Concourse’s additional reimbursement, and were not petitioning DOH in an effort to put Concourse out of business.
Moreover, the Supreme Court has observed that, “[t]he effort to influence governmental action * * * certainly cannot be characterized as a sham” where the party is successful in its lobbying efforts. (Allied Tube & Conduit Corp. v Indian Head, 486 US 492, 502 [1988].) Here, defendants were successful, since DOH rescinded the additional reimbursement, and ultimately paid a much reduced amount.
Concourse contends that the First Amendment is not an absolute defense to plaintiffs common-law claims, relying on Jews for Jesus v Jewish Community Relations Council (968 F2d 286 [2d Cir 1992]). The Jews for Jesus case is readily distinguishable. First, defendants there were not petitioning the government, but were threatening a private entity, the Stevensville Hotel, with an economic boycott if it did not cancel a contract with plaintiff. (968 F2d, at 298 [“the instant conduct was not political speech designed to secure governmental action to vindicate legitimate rights, but was a series of private communications in the context of a private dispute”].) Second, a boycott designed to secure an unlawful objective, namely violation of antidiscrimination statutes, is not protected by the First Amendment. (Supra, at 297.)
The Supreme Court has noted that “[a]t times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose. In this case, however, [the NAACP’s] ultimate objectives were unquestionably legitimate.” (National Assn. for Advancement of Colored People v Claiborne Hardware Co., 458 US 886, 933 [1982].) Here too, defendants’ actions were a legitimate response to their learning of Concourse’s concealment of the additional allocation of funds from DOH and their justifiable frustration that DOH concealed this information from them as well.
One of the few New York State court cases to deal with this issue commented that the “right to petition [the] government is privileged and is superior to [the] right to maintain an action for interference. Public policy dictates that the tort of interference not be extended to those situations wherein a citizen petitions an agency of [the] government.” (Rudoff v Huntington Symphony Orch., 91 Misc 2d 264, 266 [App Term, 2d Dept 1977].)
*92 Since defendants were merely exercising their rights as citizens to petition the government, they are entitled to First Amendment immunity.[3] The remaining four causes of action of the complaint are dismissed.
Plaintiffs cross motion to compel discovery is denied. Based on the foregoing analysis of the dispositive issues in this action, the discovery sought would serve no relevant purpose.
Accordingly, it is ordered that the motion to dismiss is granted and the complaint is dismissed with costs and disbursements to defendants as taxed by the Clerk of the Court; and it is further ordered that plaintiffs cross motion to compel discovery is denied.

. Counsel for Engelstein and Vladeck, Waldman note that plaintiff has failed to file proof of service on defendant Edward Sillies. This court deems defendants’ request for dismissal to be a motion for such relief and will dismiss this action, without prejudice, as to defendant Edward Sillies, since more than 120 days have elapsed since the filing of the summons with notice. (CPLR 306-b.)

. Neiman has conceded that the amount DOH would pay Concourse was critical to the settlement agreement with Local 144, and “had [Local 144] known that there was more money, they would have tried to get more money. That’s why we didn’t tell them.” Neiman was correct, since Local 144 believed *88 the additional money should be intended for parity payments to Concourse’s employees, which led to the July 1 meeting with DOH.

. The court also cites with approval the First Department case Hahn v Wylie (54 AD2d 629 [1st Dept 1976]), which holds that an attorney, acting in his or her professional role, cannot be found civilly liable for acts performed in good faith and for the honest purpose of protecting the interests of a client.