PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

A FISHERMAN'S BEST, INCORPORATED;
LOWCOUNTRY LOBSTERS, LIMITED;
AFB OF CHARLESTON, INCORPORATED;
F/V TRIPLE THREAT; F/V REBECCA
PAGE; F/V JOAN MARIE; F/V PROUD
MARY ELLEN,
                    *Plaintiffs-Appellants,*

v.

RECREATIONAL FISHING ALLIANCE,
                    *Defendant-Appellee,*                    No. 99-2186

v.

WILLIAM W. ALDRET; LOUIS E.
COSTA, II, MD; W. EDDIE GORDON;
JAMES F. HIGHTOWER; RUTLEDGE
LELAND; DAN LONG; TERRELL M.
RHYE; L. J. WALLACE; CHARLESTON
HARBOR PARTNERS, LLC; GULF
STREAM CAPITAL ASSOCIATES, LLC;
COEN COMPANY; RICHARD COEN,
                    *Defendants.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Falcon B. Hawkins, Senior District Judge.
(CA-97-2227-2-11)

Argued: April 5, 2000

Decided: October 31, 2002

Before MOTZ and KING, Circuit Judges, and
John C. GODBOLD, Senior Circuit Judge of the
United States Court of Appeals for the Eleventh Circuit,
sitting by designation.

Affirmed by published opinion. Senior Judge Godbold wrote the opinion, in which Judge Motz and Judge King joined.

---

**COUNSEL**

**ARGUED:** William Atkins Scott, PEDERSEN & SCOTT, P.C., Charleston, South Carolina, for Appellants. Peter G. Nistad, HOOD LAW FIRM, L.L.C., Charleston, South Carolina, for Appellee. **ON BRIEF:** Robert H. Hood, HOOD LAW FIRM, L.L.C., Charleston, South Carolina, for Appellee.

---

**OPINION**

GODBOLD, Senior Circuit Judge:

This is a companion case to *City of Charleston, South Carolina, a municipal corporation v. A Fisherman's Best, Incorporated; AFB of Charleston, Incorporated; Ivan Miller; and the fishing vessel Tri Liner*, No. 99-1991, pending in this court. The two cases are decided concurrently.

This case arose from sharp differences in the City of Charleston, South Carolina concerning commercial longline fishing and access to the City's new Maritime Center by vessels engaged in that method of fishing.[1] The City leased the Center to the Charleston County Park and Recreational Commission (PRC) for it to manage. In April 1997 PRC circulated a request for proposals from entities that might wish to operate the new Maritime Center, which had been built by the City to serve commercial fishing vessels. PRC selected the AFB group consisting of A Fisherman's Best, Incorporated; AFB of Charleston,

---

[1] A longliner uses a floating main line that may be several miles long, suspended in the water by floats, to which short lines and baited hooks are attached at intervals. It is highly regulated and federally permitted and is the dominant form of commercial fishing used by United States fishermen in the Atlantic Ocean to harvest highly migratory species such as swordfish and shark.

Incorporated; and Low Country Lobsters, Limited. PRC issued a letter of intent to award a contract to AFB. AFB proposed to serve vessels engaged in longline fishing, along with other vessels. Longlining is bitterly opposed by recreational and sportsfishermen and some environmental groups. A public outcry arose against selection of AFB.

Recreational Fishing Alliance (RFA) is a national non-profit organization whose stated purpose is rebuilding and preserving fisheries in the United States. It seeks to politically organize saltwater anglers and to safeguard their rights, protect jobs in the marine boat and tackle industry, and ensure the long-term sustainability of our nation's saltwater fisheries. It is aligned in principle to sports and recreational fishing and generally opposed to commercial fishing, and it seeks to end longline fishing as an acceptable method of commercial fishing.

The CHP group is composed of persons who wanted their group selected as operator of the Maritime Center, but their response to the request for proposals was rejected as untimely. There is evidence that they requested RFA to ask the mayor to accept their proposal. A mass meeting of sportsfishermen opposing use of the center by longliners took place in Charleston. RFA sent representatives to Charleston and became involved in the public controversy for two or more months. It wrote letters, contacted local officials and raised public consciousness. At a public forum held by PRC the president of RFA denounced longline fishing. PRC issued a letter of intent announcing that AFB had been selected as operator for the Maritime Center. Apparently there were discussions between the City and PRC, and arrangements between PRC and AFB were cancelled. AFB asserts that a contract had been made, but no document had been signed and the City says no agreement had been reached.

PRC circulated a second request for proposals. AFB and CHP responded and again AFB was selected. The public outcry resumed, and RFA and others, including CHP, planned a rally against longline fishing vessels and their potential use of the Center. Announcements were made by mail, newspapers, and over radio, and persons were urged to protest to the mayor against alleged use of City tax funds to bring out-of-state fishing vessels to South Carolina waters. In late July the mayor held a meeting in his office, and one or more represen-

tatives of RFA were included. The following day the mayor announced that he had come to better understand the issues, that he was changing his position, and that he would support recreational fishermen in the controversy.

The AFB group, joined by longline fishermen and their vessels, filed this suit in the United States District Court against RFA and CHP. Plaintiffs alleged conspiracy between RFA and CHP, restraint of trade, and interference with competition in violation of the Sherman Act, 15 U.S.C. § 1, and § 39-3-10 of the South Carolina Code of Laws. They also alleged related state law claims of interference with a contract or a prospective contract and for defamation.[2]

PRC's second selection of AFB was terminated, and the City took over operation of the Center. An operator was selected by the City, and the Center was opened. Several months later the City adopted a resolution barring from the Center longline vessels, longline tackle, and swordfish. It then brought in South Carolina state court a suit against the AFB group, seeking a judgment declaring that its resolution and the operation of the Center pursuant to the resolution were constitutional and violated no federal or state law. The case was removed to the District Court for the District of South Carolina, and the court granted summary judgment to the City. That decision has been appealed to this court, and contemporaneously with the decision of the present case it is reversed for lack of federal jurisdiction. *City of Charleston, South Carolina, Mun. Corp., v. A Fisherman's Best, Inc.; AFB of Charleston, Inc., Ivan Miller and the fishing vessel Tri-Liner*, No. 99-1991.

In the instant case claims against all defendants other than RFA were dismissed by plaintiffs. The district court granted summary judgment to RFA on all claims. It held that RFA was exempt from anti-trust liability under the *Noerr-Pennington* doctrine. *See Eastern R.R. President's Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657

---

[2]Plaintiffs brought another suit in state court against the CHP group and the City alleging breach of contract and tort claims. When the present case was decided in the United States District Court the state suit was still pending, and we are not informed of its present status.

(1965). With regard to intentional interference with prospective contractual relations the court, construing the facts favorably to plaintiffs, found that, RFA's purpose was to exercise First Amendment rights to petition the City government not to allow longliners at the Center, and that, if there was any interference with a contract, it was a by-product of the exercise of the First Amendment, and, even if there was intentional interference it was not done for an improper purpose. The conspiracy claim was rejected because there was no evidence that RFA had an improper purpose.

The defamation claim was based upon a statement made in ads and mail outs that the City was "bringing a big longline fishing fleet from Florida," and alleged implications that new boats would be docking at the Center, that the City was somehow subsidizing plaintiffs, and that the plaintiffs were destroying resources. The court found that the statements and implications were not defamatory. Moreover, it found that, regardless of who had the burden of proving falsity or truthfulness, the indisputable facts showed the statements and implications to be true.

## I. *ANTITRUST CLAIMS*

AFB alleged a Sherman Antitrust Act violation for anticompetitive acts violating § 15 U.S.C. § 1. To succeed AFB must establish that there were two persons acting in concert and that the restraint complained of constitutes an unreasonable restraint on interstate trade or commerce. *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 220 (4th Cir. 1994). AFB alleged that RFA conspired with the CHP defendants to engage in antitrust activity by opposing AFB's efforts to contract to operate the Maritime Center. As examples of RFA's unreasonable anti-competitive actions AFB alleged distribution of flyers, placing ads in newspapers, and organizing and sponsoring rallies. Plaintiffs do not contend that the City was a co-conspirator.

The district court found that no party had addressed the question of whether plaintiffs had established a violation of antitrust law. Rather, for purposes of summary judgment, plaintiffs had assumed that this issue was not disputed and that the question for decision was whether RFA was exempt from antitrust liability. The court pro-

ceeded accordingly[3] and held that RFA was exempt under the *Noerr-Pennington* doctrine. That doctrine states that horizontal competitors may join together to lobby government because antitrust violations cannot be predicated on attempts to influence the passage or enforcement of laws. The First Amendment shields such joint lobbying effort from antitrust liability even when the competitors are seeking governmental action that would eliminate competition or exclude competitors. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). The underpinning of *Noerr* and its progeny is that Congress did not intend to subject to antitrust liability actions that had the immediate purpose of influencing legitimate governmental decisionmaking processes. The doctrine provides immunity to those who petition the government for redress. *Id*. The court found that RFA was not a competitor of AFB in the fishing industry and it found that RFA's actions were simply attempts to solicit governmental action to keep longline fishing vessels from using the Maritime Center and to avoid additional fishing (by out of state vessels) off the coast of Charleston. RFA's actions, therefore, were protected by *Noerr*.

The record reveals that initially the mayor of Charleston knew nothing about longline fishing or about the controversy between sportsfishermen and longliners, and he favored AFB to be the operator of the Maritime Center. In a statement on July 18, 1997 he acknowledged that he had changed his mind. He explained that he had learned of the effects of longlining on stocks of fish, of the interests of sportsfishermen, and of the perception of citizens that governmental efforts at managing fisheries were not successful. He spoke of his fears of possible harm to the City aquarium, which was close to the docks, and to the City's interests in tourism. He described community opinion as opposed to longliners docking at the Center and told of adverse community responses and of pressures upon him reflecting that view. Thereafter the City cancelled its lease to PRC, took over operation of the Center, and later adopted a resolution banning pelagic longline vessels of any kind from docking, landing, unloading, or processing their catch at the Maritime Center.

---

[3]No party has objected to this approach.

The court found that RFA was opposed to longline fishing in general and hoped to eliminate it, and was concerned with the possibility of additional fishing by out-of-state vessels in the waters off Charleston, which are a "nursery" for spawning swordfish. The court found that no evidence supported plaintiffs argument that RFA sought to have only AFB, not longliners in general, banned from the Maritime Center and no evidence that RFA was engaged in a smear campaign against AFB.

A director of RFA had written to the mayor suggesting that he support CHP's proposal and thanking him for challenging the initial selection of AFB. The court found this was not shown to be anything other than part of RFA's lobbying against longline fishing, and that from a later letter it was clear that RFA supported CHP's proposal only because it did not include longline fishing vessels.

In this court the plaintiffs contend that *Noerr* does not apply at all to this case because "[t]he case has nothing to do with fishing, but everything to do with acquiring real estate, the maritime center." This is a mischaracterization that the record does not support. They make a related argument that *Noerr* does not apply because the City did not act as a government in leasing the Center but as a commercial enterprise. The City responded to a public need related to a struggling industry, and, using public funds, built a municipal facility. It found itself involved in a public controversy in the community it served concerning who would operate the facility. It addressed the problem. This is not a commercial activity that had a political impact, but a public-political firestorm in which competitive bidding was only incident. See *Allied Tube & Conduit, Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506 (1998).

The district court applied proper summary judgment standards. Evidence should be viewed in the light most favorable to the non-moving party, *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The court must find that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56. If no material factual disputes remain, summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317

(1986). When the record taken as whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Applying these principles, the court held that the *Noerr-Pennington* doctrine clearly applied because the actions of RFA were simply attempts to solicit government action to keep longline vessels from using a facility built with taxpayer dollars and to avoid additional fishing efforts off the coast (by out-of-state vessels), and that RFA was petitioning the government for redress and therefore was immune from antitrust liability.

## II. *ALLEGED EXCEPTIONS TO* NOERR-PENNINGTON

Not every concerted effort to influence government action is immune under *Noerr-Pennington*. The scope of this immunity depends on the source, context, and nature of the anticompetitive restraint at issue. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Unethical and deceptive practices can constitute abuses of administrative or judicial process that may result in antitrust violations. *Id.* at 500.

AFB contends that, even if *Noerr* is generally applicable, RFA's lobbying campaign is not protected from antitrust liability because it falls under one of the exceptions to *Noerr*: (1) the sham exception; (2) that RFA acted in bad faith, misrepresented information, made improper threats, and used other coercive means intended to corrupt the political or administrative processes; and (3) that this case involved a commercial bid proposal.

### A. *The Sham Exception*

*Noerr* immunity does not apply to petitions or lawsuits that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (defining the sham exception). Under the *Noerr* doctrine filing a lawsuit or seeking other government action can violate antitrust laws when it is a "sham." "A classic example [of a sham] is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but sim-

ply in order to impose expense and delay." *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991).

The essential element of the sham exception is intent to injure a competitor coupled with the absence of a genuine effort to influence the government. "[E]vidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Professional Real Estate Investors v. Columbia Pictures Indus., Inc*, 508 U.S. 49, 59 (1993). The existence of probable cause to institute legal or administrative action precludes a finding that an antitrust defendant has engaged in sham litigation. *Id*. at 62. The necessary probable cause requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication. *Id*.

RFA's lobbying effort was successful. A successful effort to influence governmental action "certainly cannot be characterized as a sham." *Professional Real Estate*, 508 U.S. at 58 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988)). *See also Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 565 (4th Cir. 1990) (holding that a litigant who successfully persuades "a neutral judge or jury that it is entitled to legal relief from the conduct of another based upon the law and facts" cannot be sued under the sham exception to *Noerr-Pennington*).

A two-step test for sham exceptions was announced in *Professional Real Estate*. The Supreme Court explained:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under the second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," *Noerr*, *supra*, 365 U.S. at 144, through the "use [of] the governmental *process* — as opposed to the *outcome* of that

process — as an anticompetitive weapon." *Omni*, 499 U.S. at 380. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability.

508 U.S. at 60-61 (brackets in original).

AFB's analysis does not satisfy the first step of the *Professional Real Estate* test. AFB did not present sufficient evidence to show that RFA's attempt to change the City's longlining policy for the Maritime Center was objectively baseless. RFA engaged in lobbying, using media and political channels to sway public opinion against longlining because of the effect that it perceived longliners would have on Atlantic fisheries. RFA could reasonably expect to succeed, and it did so. Its lobbying campaign was a success. It successfully educated local government officials concerning its views and helped to obtain a favorable governmental policy barring longline fishing vessels from mooring at a public facility.

Because AFB cannot overcome the first hurdle in the *Professional Real Estate* test we need not address RFA's subjective reasons for participating in the campaign and we do not need to discuss the second step — whether baseless action by the defendants concealed an attempt to interfere directly with the business relationship of a competitor through the use of governmental process as an anticompetition weapon. Moreover, apart from our conclusion concerning RFA's subjective reasoning, the district court found that RFA was not a competitor of the plaintiffs. That finding is not clearly erroneous.

### B. *Misrepresentation, bad faith, threats, and corruption*

AFB contends that *Noerr-Pennington* immunity should not apply because RFA organized and conducted a "smear" campaign against it, misrepresented information, made threats, and engaged in corrupt practices. There is no officially recognized *Noerr* immunity exception for any of these activities, but we will nevertheless address them as elements of the contention that RFA conducted an improper lobbying effort.

*Misrepresentation*

AFB presented no evidence that RFA deliberately made false and material representations in the course of its lobbying effort. *See Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 691 F.2d 678, 687 (4th Cir. 1982) (stating that misrepresentations, to fall within the sham exception to *Noerr* immunity must be made with the requisite intent). *See also Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995) (finding that even if litigation is not baseless the defendant is not entitled to *Noerr* immunity if it deliberately made false and material representations).

AFB's president testified generally that RFA presented false, half-true, and disparaging statements concerning longline fishing. The district court addressed four matters allegedly misrepresented by RFA: (1) that the City was bringing a big longline fishing fleet from Florida, (2) that there would be new boats operating out of the Maritime Center, (3) that the City was subsidizing longline fishing, and (4) that AFB was destroying natural resources by allowing longliners to dock at the Maritime Center. The same allegations were made in AFB's defamation claim.

There is no merit to AFB's allegation regarding the effect of longliners on natural resources. Ample evidence indicates that longlining may be destructive to marine resources. Thousands of pages of federal statutes, regulations, and proposed regulations have been created in an attempt to balance the nation's interest in protecting its fisheries against harms caused by longlining and other commercial fishing methods. Whether the harm is as great as RFA asserts, and whether it is balanced by the interests of the longline industry and the public's interest in longline fishing as a food source, do not obviate the fact that destruction of resources occurs. RFA cannot lose its *Noerr* protection for taking a position on this hotly debated topic.

RFA made no representation of fact that was not substantially true or reported by news agencies independent of RFA prior to RFA's arrival in Charleston. Many of the facts alleged by AFB as false were contained in a March 22, 1997 newspaper article written two months before RFA's arrival. This article stated that AFB hoped "to attract as many as 30 swordfish boats, shrimp trawlers and other fishing vessels" to the Maritime Center. The president of AFB testified that he

hoped to attract to Charleston vessels that historically had done business with him at other locations.

Other statements allegedly misrepresented by RFA were made by AFB or its representatives. In his deposition AFB owner Vince Pyle stated that at least one longline vessel fishing in South Carolina waters hailed out of Florida. At a mass meeting on May 5 Pyle acknowledged the nomadic nature of longline vessels that work the Atlantic from Florida to North Carolina. AFB's own operational proposals stated that it planned to dock a fleet of longliners at the Maritime Center. There were no misrepresentations.

### Threats and Corruption

James Donofrio, the president of RFA, contacted Pyle, the president of AFB, and told him that he would "call off the dogs" and cease lobbying against longliners docking at the Maritime Center if Pyle would agree not to bring longliners to the dock. According to Pyle, Donofrio claimed to have the power and connections to keep AFB out of the Maritime Center or to persuade those opposing it to withdraw their opposition if it would dock longliner vessels at another site. Pyle informed Donofrio that the AFB proposal was not financially feasible if longliners were not included, and rejected Donofrio's offer. CHP's name did not come up in this conversation. AFB sees this as a threat and a corrupt attempt to make a deal on behalf of CHP. The district court did not err in finding that this was only a conversation about settlement negotiations.

RFA wrote a letter to the mayor, thanking him for challenging the "done deal" with AFB [referring to the first selection of AFB] and recommending the acceptance of CHP as operator. This was insufficient to establish a conspiratorial relationship. A lobbying group may make recommendations through its lobbying campaign. We have previously described the mayor's change of mind about longlining. He publicly acknowledged that he had changed his mind and explained why.

AFB presented no evidence of bribes or blackmail or of any other corruption or impropriety engaged in by RFA to taint the governmental process in Charleston. In deposition testimony PRC commission-

ers Virgil Passailaigue and Tim Eubanks testified that nothing inappropriate or corrupt occurred during RFA's lobbying campaign. There is no substantial evidence of corruption in the City's own processes or of corrupt actions by RFA.

### Bad Faith

RFA is a lobbying entity. Rightly or wrongly, it perceives longline fishing as depletion and mismanagement of resources by an industry that it considers antagonistic to its goals, and it considers governmental management of fisheries as ineffective. It joined in the efforts of others having a common purpose. It had a protected right to petition the government, and plaintiffs have not shown a sufficient basis to strip it of *Noerr-Pennington* immunity.

AFB charged that RFA acted in bad faith because it was directly opposed to AFB rather than to longlining in general, therefore *Noerr* protection is inapplicable. As we have held, inquiring into the subjective rationale of RFA's lobbying campaign would be appropriate only if the campaign was objectively baseless. RFA could reasonably expect, and did achieve, a successful lobbying effort. *See Professional Real Estate*, 508 U.S. 49.

### C. *Competitive Bidding Process Exception*

*Noerr* immunity is not lost because competitive bids were involved. Corrupt bidding can fall under the sham exception to *Noerr* but only if corrupt.

AFB relies on three bidding cases. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 509 (1988) (finding efforts to influence the setting of private standards that were routinely adopted by state and local governments did not qualify for *Noerr* immunity when the defendant's activities were a sham intending only to control the standards promulgated by a private trade association); *F. Buddie Contracting, Inc. v. Seawright*, 595 F. Supp. 422 (N.D. Ohio 1984) (holding that *Noerr* immunity did not apply because of the defendant's improper relationship with a city consultant who disqualified the plaintiff's bid); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders,*

*Inc.*, 424 F.2d 25, 33 (1st Cir. 1988) (stating that statutes requiring competitive bidding required the defendant to refrain from dealing with officials who administer the bid statutes).

These cases do not create a discrete competitive bid exception to *Noerr*. Competitive bidders are free to lobby the relevant government, but they cannot do so by corrupting the bid process. The above cases reaffirm that lobbying efforts involving competitive proposals can be a sham if other evidence indicates that corrupt or questionable practices are initiated by a competitor directly involved with the bidding process. RFA was not a competitor. Allegations that it received financial benefits from recreational fishing tournaments and receives funding through a boat company that caters to sport fishermen do not overcome *Noerr* immunity.

## III. *STATE LAW CLAIMS*

AFB's state law claims allege interference with a contract and/or a prospective contract, conspiracy and defamation. All arose out of the same facts that give rise to the alleged antitrust violations. In *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999), the Third Circuit held that the same First Amendment principles on which *Noerr-Pennington* was based applied to New Jersey state tort claims for malicious prosecution, unfair competition, and tortious interference with prospective economic advantage, based on the same activity of petitioning the government that barred the federal antitrust claim. We need not adopt such a broad general rule in this case because the district court did not err in dismissing each state law claim for failure to satisfy summary judgment standards or some element of the underlying state claim.

### A. *Interference with Contractual and Prospective Contractual Relations and Conspiracy*

AFB alleged that in violation of state law RFA conspired with the CHP defendants and interfered with its contractual and prospective contractual relations with PRC. The district court held that RFA's purpose was to petition the local government not to allow longliners at the Maritime Center, that interference with AFB's prospective contract was only a by-product of RFA's campaign against longline fish-

ing and that even if the interference was intentional, it was not for an improper purpose.[4]

The elements of an intentional interference with prospective contractual relations are: (1) intentional interference with a plaintiff's potential contractual relations, (2) for an improper purpose or by improper methods, and (3) causing injury to the plaintiff. *See Crandall Corp. v. Navistar Transp. Corp.*, 395 S.E.2d 179 (S.C. 1990). If a defendant acts for more than one purpose his improper purpose must predominate in order to create liability. As an alternative to establishing an improper purpose the plaintiff may prove the defendant's method of interference was improper under the circumstances. *Id.* at 180. The improper purpose upon which AFB relies is its allegation that RFA conspired with co-defendant CHP to deprive AFB of a contract to operate the Center and to obtain for CHP the contract to operate.

A civil conspiracy is the combination of two or more parties joined for the purpose of injuring the plaintiff, thereby causing him special damages. *See LaMotte v. Punch Line of Columbia, Inc.*, 370 S.E.2d 711, 713 (S.C. 1988). To establish a concert of action a plaintiff must produce direct or circumstantial evidence from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful exercise. A conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the plaintiff. *See First Union Nat. Bank of S.C. v. Soden*, 511 S.E.2d 372, 383 (S.C. Ct. App. 1998). Nevertheless, lawful acts may become actionable if the object is to ruin or damage the business of another. *See Lamotte*, 370 S.E.2d at 713.

As we have pointed out, CHP contacted RFA and requested assistance in opposing longliners' access to the Maritime Center. RFA responded, came to Charleston and began a successful lobbying effort. CHP assisted RFA in organizing and mobilizing citizens against longlining. When it appeared that the opposition to longlining

---

[4]The district court did not address the question of whether AFB and PRC had entered into a contract but considered only interference with AFB's prospective contractual relations. No party suggests that this was error.

was successful RFA sent a letter to the mayor thanking him for his support and recommending CHP as operator.

RFA is a lobbying group organized for and engaged in lobbying against commercial fishing methods that it opposes. A grassroots effort opposing the mooring of longline vessels at the Maritime Center was under way before RFA arrived in Charleston. The thrust of the campaign was against longline fishing and not at any other elements of AFB's proposed operations at the Center. In his conversation with Vince Pyle of AFB, President Donofrio of RFA proposed to "call the dogs off" if AFB would move longline vessels to a separate facility. He did not suggest that AFB give up its status as actual or proposed sub-lessee or make any concession other than removal of longline vessels.

The district court found that RFA's purpose was to exercise its First Amendment rights to petition the local government not to allow longliners at the Maritime Center and if it were found that RFA intentionally interfered with AFB's corporate opportunity, plaintiffs did not establish that it was for an improper purpose. We cannot say that either of these findings was error. Moreover, if the defendant acts for more than one purpose its improper purpose must predominate to create liability. *Crandall Corp. v. Navistar Int'l. Transp. Corp.*, 395 S.E.2d 179.

## B. *Defamation*

The allegations that AFB says were false and defamatory are the same allegations made in AFB's antitrust claim, and they fail.

A communication is defamatory only if it is false and tends to impeach the plaintiffs reputation. *See Elder v. Gaffney Ledger, Inc.*, 511 S.E.2d 383 (S.C. 1999), *rev'd on other grounds*, 533 S.E.2d 899 (S.C. 2000). As we concluded in our antitrust analysis, the alleged defamatory statements are substantially true. Truth of the matter or substantial truth is a complete defense to a claim for defamation. *See WeSav Fin. Corp. v. Lingefelt*, 450 S.E.2d 580, 582 (S.C. 1994). Moreover, none of the allegedly false statements is inherently harmful to AFB's reputation.

The district court did not err in holding that RFA was not a competitor of AFB, that the *Noerr-Pennington* doctrine applies, that RFA is entitled to immunity, pursuant to it, and that none of the exceptions to *Noerr* apply. The decision of the district court is

*AFFIRMED*.