CRAMER, Appellant,

v.

FAIRFIELD MEDICAL CENTER et al., Appellees.

[Cite as *Cramer v. Fairfield Med. Ctr.*, 182 Ohio App.3d 653, 2009-Ohio-3338.]

Court of Appeals of Ohio,
Fifth District, Fairfield County.

No. 2007 CA 00057.

Decided June 30, 2009.

654

See also, 2008 WL 5265712.

656

Paige A. Martin, for appellant.

Hahn, Loeser & Parks, L.L.C., Jeffrey Stiltner, and Dawn Rae Grauel; and Bricker & Eckler, L.L.C., Richard S. Lovering, and Donald R. Keller, for appellees.

EDWARDS, Judge.

{¶ 1} Plaintiff-appellant, Timothy Cramer, M.D., appeals from the August 13, 2007 entry of the Fairfield County Court of Common Pleas granting the motions for summary judgment filed by defendants-appellees Fairfield Medical Center, William Lister, Jennifer Black Spiller ("Jennifer Black"), Vicki Sweeney, Jennifer Martin, Fairfield Imaging Associates, Ronald Osgood, M.D., Gerald Smidebush, M.D., and Susan Enlow, M.D.

## STATEMENT OF THE FACTS AND CASE

{¶ 2} Timothy Cramer began his employment as a radiologist with appellee Fairfield Imaging Associates ("FIA") in March of 2000. Appellees Enlow, Osgood, and Smidebush are physicians with appellee FIA. Smidebush is also chairman of the radiology department at appellee Fairfield Medical Center ("FMC"). While employed as a radiologist with appellee FIA, appellant provided radiology services to appellee FMC in accordance with an agreement between appellees FIA and FMC. Appellant's employment agreement with appellee FIA stated in Section 8:

{¶ 3} "(a) In the event that Dr. Cramer at any time shall not be duly licensed or otherwise legally authorized to render professional services as a radiologist in the State of Ohio, or shall not be approved for and maintain a Medical Staff appointment at Fairfield Medical Center or its successor in interest, then this Agreement shall immediately and automatically terminate * * *."

{¶ 4} In 2000, appellant, who was married, began a consensual relationship with a nurse, Rebecca Flautt, who was in the radiology department of FMC. Jolene Cramer, appellant's then wife, called appellee Enlow and told her that appellant had physically injured her and had molested their children. Enlow testified during her deposition that she thought that she had heard about the affair from a technologist and that she probably had discussed the affair with her partners. She testified that she probably spoke with Smidebush because his office was next to hers.

{¶ 5} On or about March 21, 2001, appellant sent a letter to Howard Sniderman, Vice President of Ancillary Services at appellee FMC, advising him that he was in the process of getting a divorce and that the gossip in the Radiology Department about his relationship with Rebecca Flautt "has lately become incessant and destructive." Appellant, in his letter, indicated that two technologists, appellees Sweeney and Black, were responsible for much of the gossip and asked that appellee FMC take action to stop the gossip. On March 29, 2001, appellee Lister, the radiology department manager, and Carol Cogossi, head of

human resources, met with appellees Sweeney, Black, and Martin, advised them of the complaint made about their gossiping, and advised them to avoid gossiping.

{¶ 6} Between March 29, 2001, and April 2, 2001, appellee Black alleged that appellant was harassing her and provided documentation of the alleged harassment to appellee Lister. On July 6, 2001, appellant reported appellee Jennifer Black and another technologist for allegedly leaving a patient unattended for at least an hour, putting the patient, who was thought to have a blood clot in her lungs, at risk. Appellant requested that the matter be investigated.

{¶ 7} Thereafter, on or about July 24, 2001, appellant sent a letter to appellee Smidebush alleging that his working relationship with Sweeney had deteriorated over the past few months. Appellant indicated that on July 19, 2001, Sweeney had, he believed, intentionally pulled the wire out of a patient having an abdominal aortagram. Appellant requested that Sweeney not be assigned to "scrub" on cases with him in the future. According to appellant, appellee Smidebush refused to investigate, telling appellant that he was the one causing the problems. Smidebush, in a letter to appellant dated July 25, 2001, stated:

{¶ 8} "You have accused her [appellee Vicki Sweeney] of intentionally performing an act while assisting you which sabotaged the procedure and caused added discomfort to the patient to re-establish arterial access. In your stated opinion, an adversarial relationship has developed which placed patients at risk. You have requested that Vicki not be assigned to 'scrub' on cases with you in the future.

{¶ 9} "As you know, we currently have only three trained angio techs, of which Vickie is the lead tech with the most experience. It is not possible for the department to staff the angio suite in a manner that will ensure that Vickie does not assist you during procedures.

{¶ 10} "As you have made it clear that a risk to patients exists because of your adversarial relationship, I have a duty to honor your request. Effective immediately, I am removing you from the angiography schedule in an attempt to assure patient safety. Your assigned work schedule will be adjusted accordingly."

{¶ 11} On or about July 27, 2001, Smidebush and Osgood, president of FIA, sent a letter to appellant asking the "exact basis" for his "current discontent." The two indicated that they could not reasonably investigate appellant's claims until they knew who appellant was upset with, what had been done to him or said about him that appellant felt was unfair, when the events had occurred, and what information appellant had in support of his allegations. When appellant, on August 28, 2001, hand-delivered his written response, Osgood called the police and indicated that appellant had threatened him.

{¶ 12} Thereafter, on August 31, 2001, Mina Ubbing, the president of FMC, notified appellant that he was being summarily suspended. The chairman of appellee FMC's board of trustees, in an undated letter to appellant, stated:

{¶ 13} "Due to the escalation of various incidents regarding your disruptive behavior as a Medical Staff member at Fairfield Medical Center and in order to assure a safe environment at Fairfield Medical Center, you have been provided with notice that effective Friday, August 31 st your clinical privileges and medical Staff appointment have been summarily suspended pending further investigation by the Board of Trustees. (This action is being taken pursuant to our authority and obligations under The code of Regulations of Fairfield Medical Center, Section 5.04—Summary Suspensions.) You were notified in person of this summary suspension by the President of the Hospital, Mina Ubbing, on Friday, August 31 st, acting on my behalf as Chairman of the Board of Trustees * * *.

{¶ 14} "While other issues may or may not surface during the course of our review, the issues of concern which have led to our action are as follows:

{¶ 15} "Disruption of the normal function of the department as evidenced by:

{¶ 16} "1) complaints from staff of harassment

{¶ 17} "2) numerous unscheduled prolonged meetings of the radiology group during normal business hours and after hours to address your behavior and issues raised by you

{¶ 18} "3) conflict with department management and failure to take issues regarding staff through proper channels as requested

{¶ 19} "4) continued imposition of personal issues upon department staff during business hours

{¶ 20} "5) ongoing concern regarding your perceived threatening demeanor and cryptic remarks which raise concerns about staff safety

{¶ 21} "6) failure to alter behavior in spite of requests to do so both by Hospital Administration and the radiology group

{¶ 22} "7) a direct threat made by you to one of the other radiologists."

{¶ 23} The chairman, in a letter to appellant dated September 7, 2001, advised appellant that the board of trustees, at a meeting held the same day, had unanimously voted to continue the summary suspension "until such time as an investigation is completed and a decision made as to the action, if any, which should be taken."

{¶ 24} On September 21, 2001, appellee FIA terminated appellant's employment agreement based on the indefinite suspension of his privileges at appellee FMC. The termination was pursuant to Section 8 of appellant's employment

agreement with appellee FIA. FIA, in its September 21, 2001 letter to appellant, stated that it was not renewing his employment agreement ending March 20, 2002.

{¶ 25} As memorialized in a letter to appellant from FMC's chairman of the board of trustees dated October 18, 2001, the board voted to continue appellant's summary suspension.

{¶ 26} In October 2001, appellant filed a lawsuit against FMC in the United States District Court for the Southern District of Ohio, Eastern Division. Appellant sought an injunction against appellee FMC to prevent it from reporting him to the National Database of Physicians. Appellant and FMC entered into a settlement agreement and mutual release, which stated:

{¶ 27} "i. Save and except for the agreement and obligations set forth in this agreement, Dr. Cramer hereby releases and forever discharges Fairfield from any and all claims, controversies, actions, demands, causes of action, debts, obligations, damages, liabilities, duties, agreements or contracts of every kind and description, whether known or unknown, and whether at law or in equity, which Dr. Cramer now has, has had, or hereafter may have against Fairfield arising out of any matter, cause or thing from the beginning of the world to the date of this Settlement Agreement, including, but not limited to, any and all claims, causes of action, liability or damages arising out of the acts, transactions, contracts, agreements, bylaws, occurrences or events alleged in the pleadings or which could have been alleged in the pleadings or other papers filed in the litigation."

{¶ 28} The settlement agreement and mutual release defined "Fairfield" as Fairfield Medical Center, its present and former officers, directors, employees, agents, attorneys, representatives, successors, heirs, and assigns.

{¶ 29} Appellant's federal case was then voluntarily dismissed with prejudice on December 26, 2002.

{¶ 30} On September 20, 2005, appellant and Rebecca Cramer, nee Rebecca Flautt, filed a complaint against appellees FIA, FMC, Smidebush, Osgood, and Enlow. The two, in their complaint, also named appellees Sweeney, Martin, Black, and Lister as defendants. Appellant filed an amended complaint on February 14, 2006. In Count One of the amended complaint, appellant alleged that appellee FIA had breached its contract of employment with him and its duty of good faith and fair dealing. Appellant in Count Two alleged that appellee FIA had wrongfully discharged him in violation of Ohio's policy that protects whistleblowers and in violation of Ohio's quality-assurance statutes as well as the common law of assault. Appellant and Rebecca Cramer, in Count Three of the amended complaint, alleged that appellees Lister, Black, Sweeney, Martin, Enlow, Smidebush, and Osgood conspired to defame their good name and reputation

and conspired to tortiously interfere with appellant's staff privileges through their gossip and defamatory statements.

{¶ 31} Rebecca Cramer, in Count Four of the amended complaint, set forth sexual-harassment claims against appellee FMC. She alleged that she experienced unwelcome sexual harassment and was retaliated against. Appellant, in Count Five of the amended complaint, alleged that appellees Smidebush, Osgood, Enlow, Sweeney, and Black tortiously interfered with his relationship with appellee FMC by providing false and salacious information that was used by appellee FMC to suspend his hospital privileges. Finally, appellant, in Count Six of the amended complaint, alleged:

{¶ 32} "51. The Defendants, FMC, fraudulently manipulated the circumstances surrounding Plaintiff, Dr. Cramer's allegations of improper technician performance on patients, to make it appear as if the hospital had summarily suspended his privileges. In fact, his hospital privileges were never suspended; the hospital failed to follow any of the procedures outlined in the Hospital Medical By-laws for removing a physician's privileges, and had no basis in fact to institute such proceedings.

{¶ 33} "52. Defendant, FMC, refused to provide Plaintiff, Dr. Cramer with any due process, and never properly investigated the incidents of which he complained that could have caused serious patient injury.

{¶ 34} "53. The Defendants, FMC created the false threat of suspended privileges in order to induce the Plaintiff to sign a release which would prevent Plaintiff, Dr. Cramer, from being paid for the damage they did to his career, his finances, and his reputation.

{¶ 35} "54. The Plaintiff, Dr. Cramer, received no consideration for the promise to forebear from any suits for damages as a result of the Defendants' FMC, and individuals' behavior."

{¶ 36} All appellees filed motions for summary judgment. As memorialized in an entry filed on August 13, 2007, the trial court granted the motions for summary judgment with the exception that the trial court denied the motion for summary judgment filed by appellees FMC, Lister, Black, Sweeney, and Martin regarding Count Four of the amended complaint. A jury trial on that count commenced on September 11, 2007. As memorialized in an entry filed on September 17, 2007, the jury found in favor of Rebecca Cramer and against appellee FMC on her hostile-environment sexual-harassment claim and awarded her $146,840. The jury found in favor of appellee FMC on Rebecca Cramer's retaliation claim.

{¶ 37} Appellant now raises the following assignments of error on appeal:

{¶ 38} "I. Whether the trial court erred in dismissing Dr. Cramer's breach of contract claim since the evidence shows FIA breached its duty of good faith and fair dealing.

{¶ 39} "II. Whether the trial court erred in dismissing Dr. Cramer's wrongful discharge claims based on a clear violation of Ohio's policy protecting patients from assault and employees who report workplace safety violations.

{¶ 40} "III. Whether the trial court erred in granting immunity to FIA physicians under HCQIA when they participated in bad faith fraudulent peer review activities.

{¶ 41} "IV. Whether Dr. Cramer's claim for tortious interference with business relations against FIA was timely filed within four years of when he discovered the harm caused by the interference.

{¶ 42} "V. Whether the trial court erred in failing to set aside a release fraudulently obtained based upon illegal consideration."

{¶ 43} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 506 N.E.2d 212. Therefore, we must refer to Civ.R. 56(C), which provides: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶ 44} Pursuant to the above rule, a trial court may not enter summary judgment if it appears that a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the nonmoving party has no evidence to prove its case. The moving party must specifically point to some evidence demonstrating that the nonmoving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue of material fact for

trial. *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164, citing *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

{¶ 45} It is based upon this standard that we review appellants' assignments of error.

I

{¶ 46} Appellant, in his first assignment of error, argues that the trial court erred in dismissing his breach-of-contract claims against appellee FIA because appellees Osgood, Enlow, and Smidebush, who are referred to as the "FIA Physicians," breached their duty of good faith and fair dealing. We disagree.

{¶ 47} As is stated above, after appellant's privileges at appellee FMC were suspended, appellant's employment agreement with appellee FIA was terminated in accordance with Section 8 of the same. Section 8 states:

{¶ 48} "(a) In the event that Dr. Cramer at any time shall not be duly licensed or otherwise legally authorized to render professional services as a radiologist in the State of Ohio, or shall not be approved for and maintain a Medical Staff appointment at Fairfield Medical Center or its successor in interest, then this Agreement shall immediately and automatically terminate."

{¶ 49} Appellant now contends that "the radiologists [appellees Osgood, Smide-bush, and Enlow] at FIA participated in the gossip sessions with the technologists once Dr. Cramer's affair * * * came to light, and exploited the tension between the technologists and Dr. Cramer to create circumstances that led to a sham peer review process that stripped Dr. Cramer's privileges to practice at FMC," leading to the termination of his agreement with appellee FIA.

{¶ 50} However, Ohio law does not recognize a good-faith-and-fair-dealing requirement in employment-at-will relationships. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 105, 19 OBR 261, 483 N.E.2d 150; *Edelman v. Franklin Iron Metal Corp.* (1993), 87 Ohio App.3d 406, 411, 622 N.E.2d 411. Section 7 of appellant's contract with appellee FIA provides that either appellee FIA or appellant could voluntarily terminate the contract at any time *without cause*. While appellant argues that Section 8, captioned Termination of Employment for Cause, removes the employment agreement from the at-will clause in Section 7, we do not agree. Although the employment agreement states in Section 8 that appellant's employment with appellee FIA will terminate if appellant loses his medical staff appointment at FMC, nowhere does the agreement state that appellant may be discharged only with just cause. Nor does the agreement state that appellant's employment agreement will remain in effect as

long as appellant has privileges at appellee FMC. We find that appellant was an at-will employee and that no duty of good faith and fair dealing was owed to him.

{¶ 51} While appellant also contends that appellant's employment was not at will because Section 7 of the employment agreement permitted either side to voluntarily terminate the agreement by giving four months prior written notice, we disagree. Employment terminated on the giving of a specified notice is still employment at will and not employment for a specified term. See *La France Elec. Constr. Supply Co. v. Interntl. Bhd. of Elec. Workers, Local No. 8* (1923), 108 Ohio St. 61, 88, 140 N.E. 899. Specifically, when an employment agreement requires a written notice of the employee's intention to terminate employment, the notice provision does not establish a term for the duration of a contract, but merely a period of convenient notice, and the relationship between the employer and the employee remains at will. Id.

{¶ 52} Based on the foregoing, we find that the trial court did not err in granting summary judgment on appellant's breach-of-contract claim.

{¶ 53} Appellants first assignment of error is, therefore, overruled.

## II

{¶ 54} Appellant, in his second assignment of error, argues that the trial court erred in granting summary judgment on his claim that appellee FIA had wrongfully discharged him in violation of Ohio's policy of "protecting patients from assault and employees who report workplace safety violations." Appellant maintains that he was discharged for asking for investigations into two incidents in which technologists allegedly intentionally jeopardized patient care and argues that his discharge was in violation of public policy.

{¶ 55} In essence, appellant argues that FIA wrongfully discharged him because FMC suspended his privileges for trying to report employee actions that jeopardized the physical safety of patients.

{¶ 56} Pursuant to *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, a discharged employee has a private cause of action sounding in tort for wrongful discharge when his or her discharge is in contravention of a "sufficiently clear public policy." Id. at 233, 551 N.E.2d 981. In *Greeley,* the Ohio Supreme Court recognized that the public policy was "sufficiently clear" when the General Assembly had adopted a specific statute forbidding an employer from discharging or disciplining an employee on the basis of a particular circumstance or occurrence. *Greeley* noted other exceptions might be recognized when the public policy could be deemed to be "of equally serious import as the violation of a statute." Id. at 235, 551 N.E.2d 981. "The existence of such a public policy may be discerned by the Ohio judiciary based on sources

such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." *Painter v. Graley* (1994), 70 Ohio St.3d 377, 384, 639 N.E.2d 51.

{¶ 57} In order to establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must demonstrate:

{¶ 58} "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

{¶ 59} "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

{¶ 60} "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

{¶ 61} "4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis added.) Id. at 384, 639 N.E.2d 51, fn. 8. See also *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526, ¶ 7–10.

{¶ 62} The clarity and the jeopardy elements are questions of law and policy to be determined by the court. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 70, 652 N.E.2d 653. The causation and overriding-justification elements are questions of fact to be determined by the trier of fact. Id.

{¶ 63} The crucial issue for determination is whether appellee demonstrated that a clear public policy existed that prevented his discharge (the "clarity element"). See *Wiles*, 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526. As an initial matter, we note that appellant, in his brief, concedes that he failed to commence a civil action under R.C. 4113.52 within 180 days of his discharge and that any whistleblower claim under that section is time-barred. R.C. 4113.52, Ohio's "Whistleblower Act," states: "If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation * * *."

{¶ 64} Thus, appellant was required to identify a source of public policy separate and apart from the public policy embodied in R.C. 4113.52. See *Lesko v. Riverside Methodist Hosp.*, Franklin App. No. 04AP–1130, 2005-Ohio-3142, 2005 WL 1482549, ¶ 34. It was appellant's burden to indicate the specific public policy at issue and to establish how that clear public policy was violated by his termination. *Poland Twp. Bd. of Trustees v. Swesey*, Mahoning App. No. 02 CA 185, 2003-Ohio-6726, 2003 WL 22946148, ¶ 10. We concur with the trial court that appellant failed to do so. Appellant failed to identify an additional source of public policy separate from the public policy embodied in R.C. 4113.52. Appellant was terminated by appellee FIA pursuant to Section 8 of his employment agreement after his privileges at appellee FMC were summarily suspended. Appellant has failed to allege or even argue how Ohio's public policy was violated by his discharge. In short, we concur with appellees that appellant has failed to allege any facts indicating why appellee FIA discharged him or how such discharge contravened a clear public policy. While appellant argues that his discharge was in violation of R.C. 5122.32, which concerns confidentiality of quality-assurance records, appellant failed to show or argue how his discharge was caused by a violation of such section or other common-law claims.

{¶ 65} Appellant cites R.C. 2903.11, the felonious-assault statute, for the proposition that Ohio has a clear public policy "that prohibits assault, or unprivileged and unconsenting touching of a patient." However, that statute does not support appellant's contention that a "clear public policy exists separate from the dictates of R.C. 4113.52." *McNett v. Hardin Community Fed. Credit Union*, Allen App. No. 1–04–46, 2004-Ohio-6957, 2004 WL 2940872, ¶ 23. See also *Evans v. PHTG*, Trumbull App. No. 2001–T–0054, 2002-Ohio-3381, 2002 WL 1401476, ¶ 38 in which the court held: "The essence of appellant's claim is that the public policy of this state encourages employees to report criminal conduct occurring in the workplace to their employers. However, * * * this particular public policy upon which appellant relies is specifically set out in the whistleblower statute."

{¶ 66} Appellant's second assignment of error is, therefore, overruled.

### III, IV

{¶ 67} Appellant, in his third and fourth assignments of error, argues that the trial court erred in granting summary judgment on Counts Three and Five of appellant's amended complaint. We disagree.

{¶ 68} As is stated above, appellant, in Count Three of the amended complaint, alleged that appellees Lister, Black, Sweeney, Martin, Enlow, Smidebush, and Osgood conspired to defame his good name and reputation and conspired to tortiously interfere with appellant's staff privileges through their gossip and defamatory statements. Appellant, in Count Five of the amended complaint,

alleged that appellees Smidebush, Osgood, Enlow, Sweeney, and Black tortiously interfered with his relationship with appellee FMC by providing false and salacious information that was used by appellee FMC to suspend his hospital privileges. The trial court, in its August 13, 2007 entry, found that such claims were time barred.[1]

{¶ 69} As the court stated in *Cully v. St. Augustine Manor* (Apr. 20, 1995), Cuyahoga App. No. 67601, 1995 WL 237129: "[A] claim for conspiracy cannot be made subject of a civil action unless something is done which, in the absence of the conspiracy allegations, would give rise to an independent cause of action. *Katz v. Banning* (1992), 84 Ohio App.3d 543, 552, 617 N.E.2d 729; *Palmer v. Westmeyer* (1988), 48 Ohio App.3d 296, 300, 549 N.E.2d 1202; and *Stafford v. Greater Cleveland Regional Transit Auth.* (Dec. 23, 1993), Cuyahoga App. Nos. 63663 & 65530, 1993 WL 536089. Thus, the applicable statute of limitations for the underlying cause of actions applies to the civil conspiracy charge. (Emphasis added)." Id. at *4. R.C. 2305.11 requires that an action for libel or slander, which includes defamation, be brought within one year after the cause of action accrued. A cause of action for defamation accrues upon the date of publication of the defamatory matter or at the time the words are spoken. See *Lewis v. Delaware Cty. Joint Vocational School Dist.*, 161 Ohio App.3d 71, 2005-Ohio-2550, 829 N.E.2d 697, and *Altier v. Valentic*, Geaga App. No. 2003–G–2521, 2004-Ohio-5641, 2004 WL 2376265.

{¶ 70} In the case sub judice, the allegedly defamatory statements were made prior to appellant's summary suspension of privileges in 2001. Appellant did not file his complaint in this matter until 2005. While appellant argues that appellant's cause of action for conspiracy to defame did not commence until he was reasonably aware of the injury associated with the act, we note that this court has rejected applying the discovery rule to defamation claims.[2] See *Lewis* at ¶ 38 ("With regard to appellant's argument that the trial court should have applied the discovery rule, we find that the date of publication and not the discovery thereof is the time for accrual of such an action. *Snell v. Drew* (Nov. 1, 1985), Lucas App. No. L–85–074, at 4, 1985 WL 8216; *Rainey v. Shaffer* (1983), 8

---

1. We note that appellant, in his third assignment of error, argues that the trial court erred in granting immunity to appellees Enlow, Smidebush, and Osgood under the Health Care Quality Immunity Act ("HCQIA"). However, we note that the trial court held that those appellees were entitled to immunity as an alternative reason for granting summary judgment on counts three and five.

2. The discovery rule was developed in certain bodily injury and medical-malpractice cases to ease "the unconscionable result to innocent victims who by exercising even the highest degree of care *could not have* discovered *the cited wrong.*" (Emphasis added.) *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St.3d 111, 114, 5 OBR 247, 449 N.E.2d 438.

Ohio App.3d 262, 8 OBR 354, 456 N.E.2d 1328; *Palmer v. Westmeyer* (1988), 48 Ohio App.3d 296, 549 N.E.2d 1202"). We find, therefore, that the trial court did not err in finding that appellant's conspiracy-to-defame claim was time-barred and granting summary judgment on such claim.

{¶ 71} As is stated above, appellant, in Counts Three and Five, set forth claims of tortious interference. The statute of limitations for a claim of tortious interference with contract is four years pursuant to R.C. 2305.09(D). Appellant, in the case sub judice, was advised verbally by Mina Ubbing, appellee FMC's president, on August 30, 2001, that he was being summarily suspended. At such time, appellant was escorted by security guards off of the premises. Appellant did not file his complaint until September 20, 2005, which is more than four years after such date. Appellant argues that his "cause of action sounding in conspiracy, or in tortious interference with contract, or with prospective relations cannot begin to run until he [appellant] understood the magnitude of his injury" and that he did not understand the same until he was notified by appellee FMC on October 18, 2001, that his privileges had been suspended indefinitely and on December 4, 2001, when appellee FIA terminated his agreement. However, appellant knew that he had suffered an injury when he was advised on August 30, 2001, of his summary suspension. This court is unaware of any case law, nor does appellant cite any, applying the discovery rule to claims of tortious interference.

{¶ 72} Based on the foregoing, we find that the trial court did not err in holding that appellant's tortious-interference claims in Counts Three and Five of the amended complaint were time-barred and granting summary judgment on such claims.

{¶ 73} Appellant's third and fourth assignments of error are, therefore, overruled.

## V

{¶ 74} Appellant, in his fifth assignment of error, contends that the trial court erred in granting summary judgment on Count Six of appellant's amended complaint. Appellant, in Count Six, had sought to set aside the settlement agreement and mutual release between appellant and appellee FMC regarding the federal case on the basis that the same was fraudulently obtained. According to appellant, the release "is void, predicated on a fraudulent 'peer review' procedure that violated [appellee FMC's] By-laws, denied [appellant] due process, and forced him to sign a contract of adhesion."

{¶ 75} Appellant, in Count Six of his amended complaint, specifically alleged as follows:

{¶ 76} "The Defendant's FMC, fraudulently manipulated the circumstances surrounding Plaintiff, Dr. Cramer's allegations of improper technician perform-ance on patients, to make it appear as if the hospital had summarily suspended his privileges. In fact, his hospital privileges were never suspended; the hospital failed to follow any of the procedures outlined in the Hospital Medical By-laws for removing a physician's privileges, and had no basis in fact to institute such proceedings.

{¶ 77} "Defendants, FMC, refused to provide Plaintiff, Dr. Cramer with any due process, and never properly investigated the incidents of which he com-plained that could have caused serious patient injury.

{¶ 78} "The Defendants, FMC created the false threat of suspended privileges in order to induce the Plaintiff to sign a release which would prevent Plaintiff, Dr. Cramer, from being paid for the damage they did to his career, his finances, and his reputation.

{¶ 79} "The Plaintiff, Dr. Cramer, received no consideration for the promise to forebear from any suits for damages as a result of the Defendants' FMC, and individuals' behavior."

{¶ 80} In sum, Count Six alleges that FMC made it appear that Cramer's privileges had been suspended when, in fact, the privileges had not been suspended and could not have been suspended because Cramer had not received due process in the peer-review process.

{¶ 81} As is stated above, appellant, in October 2001, filed a lawsuit against appellee FMC in the United States District Court for the Southern District of Ohio, Eastern Division, seeking an injunction against appellee FMC to prevent it from reporting him to the National Database of Physicians. Appellant and appellee FMC entered into a settlement agreement and a mutual release and, on December 26, 2002, appellant voluntarily dismissed his complaint against appellee FMC with prejudice. Appellant voluntarily dismissed all claims, known or unknown, that he had against appellee FMC.

{¶ 82} In the case sub judice, appellant attached an affidavit to his April 3, 2006, brief in opposition to the motion for summary judgment filed by appellee FMC with respect to Count Six. The affidavit establishes that appellant was aware of the alleged fraud *prior* to his voluntary dismissal of the claims against appellee FMC on December 26, 2002, in the federal case. Appellant, in his affidavit, alleged as follows:

{¶ 83} "2. I first contacted Joe Vitale at the Cleveland Clinic Foundation looking for new employment on September 20, 2001, by sending him my CV, and had my first meeting with him on September 27, 2001. It was in December, 2001,

when I learned from him that FMC had not verified that my privileges had been suspended.

{¶ 84} "3. In fact, they informed him that I was Active Staff.

{¶ 85} "4. The undated letter from James Parker, M.D., is a true and accurate copy of the letter I received after my August 31, 2001 meeting with Mina Ubbing, where she told me that my privileges were suspended. I did not receive that letter until a few days after the meeting with Ms. Ubbing.

{¶ 86} "5. The hospital kept telling me that I was going to be given an opportunity to request a hearing. Meanwhile, Executive Committee of the Board of Trustees met on September 7th, 2001, and continued the 'suspension' of my privileges. Present at that meeting were Mina Ubbing, James Parker, Jerome Roche, Vincent Burgess and Sandy Davis, along with two other attorneys for the hospital.

{¶ 87} "6. I was not informed prior to the meeting what the factual nature of the allegations were that provided the basis for the suspension of my privileges; I was given only 3 or 4 minutes to talk, and was then escorted from the meeting. I was told this was not a hearing.

{¶ 88} "7. I was told by a physician on the staff at the hospital that the reason for the suspension of my privileges was to help FIA get rid of me without having to buy out my contract.

{¶ 89} "8. Bill Lister bragged at a technologist's meeting in early September, 2001, that he had gotten rid of 'half' the problem (referring to my summary suspension).

{¶ 90} "9. The termination of my employment was not finalized until December, 2002.

{¶ 91} "10. I never received the hearing I requested from FMC.

{¶ 92} "11. No investigation was ever conducted into the evidence I gave to the Executive Committee, including the list of witnesses I asked them to contact on my behalf."

 {¶ 93} Appellant now contends that appellee FMC withheld information that he needed to "assess the situation at the time the prior litigation was settled." Appellant further alleges in his brief that only after he filed the case sub judice did he find evidence of "Bill Lister and Jennifer Black feeding distorted and false information on a regular basis to Dr. Osgood, Smidebush" and others. However, as noted by appellees, "as confirmed by the April 3, 2006, Affidavit of Dr. Cramer * * *, Plaintiff-appellant had prior knowledge of the claims he knowingly released when he signed the Settlement Agreement and Mutual Release and authorized his attorney to file a Notice of Voluntary

Dismissal with Prejudice on December 26, 2002." Appellant discovered the alleged fraud between September 2001 and December 2001. We find that the release bars the claims alleged in Count Six.[3]

{¶ 94} Based on the foregoing, we find that appellant has failed to create a genuine issue of material fact with respect to the allegations contained in Count Six. Construing the evidence in appellant's favor, we find that appellant has failed to demonstrate that the release was fraudulently obtained based upon illegal consideration.

{¶ 95} Appellant also alleges that the release was an unconscionable contract of adhesion that he signed because he had no meaningful choice. In other words, appellant had to sign the release or a report would have been sent to the National Physicians Data Base about appellant's privileges being suspended, and that report would prevent him from obtaining employment.

{¶ 96} Appellant provides little analysis of this issue. But we find that it was not an unconscionable contract of adhesion. The appellant had a meaningful choice. He could have pursued his litigation, and if his rights had been as blatantly violated as he alleges, then he would have prevailed in obtaining an injunction to prohibit a report being sent to the National Physicians Data Base. He decided not to take any risk. This fact does not make the settlement agreement an unconscionable contract of adhesion.

{¶ 97} Appellant's fifth assignment of error is, therefore, overruled.

{¶ 98} Accordingly, the judgment of the Fairfield County Court of Common Pleas is affirmed.

Judgment affirmed.

GWIN, P.J., and FARMER, J., concur.

───────

3. We note that "[i]t is axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation and that such agreements are valid and enforceable by either party." *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.* (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431.