[Cite as *QFS Transp., L.L.C. v. Wall Street Sys., Inc.*, 2021-Ohio-1323.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| QFS TRANSPORTATION, LLC, | : | APPEAL NOS.  C-200102 |
| | | C-200114 |
| Plaintiff-Appellee/Cross-Appellant, | : | TRIAL NOS.    A-1802329 |
| | : | |
| vs. | | |
| | : | *O P I N I O N.* |
| WALL STREET SYSTEMS, INC., | | |
| | : | |
| Defendant-Appellant/Cross-Appellee. | | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  April 16, 2021

*Frost Brown Todd, LLC, E. Todd Wilkowski, Ryan S. Lett,* and *Simon Y. Svirnovskiy* for Plaintiff-Appellee/Cross-Appellant,

*Paul Croushore* and *John Manos* for Defendant-Appellant/Cross-Appellee.

**BERGERON, Judge.**

{¶1} In this clash between business competitors over the affections of an agent, the jilted competitor accuses the other of improperly poaching the agent; and the other counters by claiming that the whole litigation is a sham, evidencing unfair competition perpetrated by the rival. Naturally, the two squared off and embarked on epic litigation, with claims and counterclaims swirling. Regardless, surveying the record, the trial court found that neither party managed to raise an issue of material fact with regard to its respective claim, and granted cross-motions for summary judgment. Each party remains dissatisfied with this result, prompting an appeal and cross-appeal—but we find their challenges unavailing, and we affirm the trial court's judgment.

I.

{¶2} This appeal stems from a contractual dispute involving three key players. QFS Transportation, LLC ("QFS") is a shipping-logistics company that offers common carrier services to various independent-contractor agencies; Valhalla Transportation, LLC ("Valhalla") is a Kansas-based trucking agency operated by Mark and Denise Wilson. And Wall Street Systems Inc. ("Wall Street") is a key competitor to QFS.

{¶3} In August of 2015, QFS executed a contract for agency services with Valhalla. Valhalla agreed to act as an exclusive agent for QFS during the agreement's term, and QFS agreed to provide Valhalla with a variety of common carrier services. The agreement was terminable upon breach or 30-days' notice by either party, but included a three-year non-solicitation clause applicable to any "Carrier Business."

{¶4}　By early 2018, Valhalla grew dissatisfied with QFS's common carrier services and began exploring a possible transfer to another carrier, which prompted Wall Street to enter the scene.　As one of QFS's competitors, Wall Street learned of Valhalla's dissatisfaction and offered to cure its problems by forging a new relationship with it.　After a brief courtship, Valhalla agreed to terminate its contract with QFS and become an agent for Wall Street, bringing several of its Kansas-based customers along.

{¶5}　But Valhalla's decision to jump ship to Wall Street did not sit well with QFS.　In May of 2018, QFS filed this suit against Valhalla and Wall Street, alleging breach of contract against Valhalla and tortious interference with a contract against Wall Street.　Convinced that this litigation was a charade, Wall Street launched a counterclaim against QFS for unfair competition via sham litigation.　The parties completed substantial discovery, and in November of 2019, QFS and Wall Street cross-moved for summary judgment on their respective claims.　The trial court granted summary judgment to Wall Street on QFS's tortious interference claim, but then granted summary judgment to QFS on Wall Street's unfair competition claim (thereby dismissing Wall Street from the litigation).　After QFS and Valhalla reached a settlement, Wall Street appealed the trial court's denial of summary judgment, and QFS responded in kind.

II.

{¶6}　In its first and only cross-assignment of error, QFS argues that material issues of fact remained with respect to its tortious interference claim against Wall Street, which should have allowed it to reach a jury.　Since success on the merits of this tortious interference claim would necessarily dispel Wall Street's allegations of sham litigation, we will address the cross-appeal first.

{¶7} We "review the grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party." *Walker on behalf of Estate of Walker v. Albers Ins. Agency,* 2019-Ohio-1316, 134 N.E.3d 896, ¶ 9 (1st Dist.). On a motion for summary judgment, "[t]he moving party bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of any genuine issues of material fact*." Taft, Stettinius, & Hollister, LLP v. Calabrese*, 2016-Ohio-4713, 69 N.E.3d 72, ¶ 10 (1st Dist.). If and when the moving party meets this burden, "the nonmoving party must then present evidence that some issue of material fact remains to be litigated." *Id.*

{¶8} To survive summary judgment on its tortious interference claim, QFS must demonstrate that: 1) a contract existed; 2) Wall Street knew of that contract; 3) Wall Street intentionally procured a breach of that contract; 4) Wall Street acted without justification; and 5) QFS suffered damages. *See Casciani v. Critchell,* 1st Dist. Hamilton No. C-140338, 2015-Ohio-977, ¶ 30. The parties do not dispute the satisfaction of the first two elements. But Wall Street contends that, even after months of discovery, QFS cannot point to any evidence supporting the remaining three elements.

{¶9} Like the trial court, we fail to see how QFS can satisfy the third element—intentional inducement of a breach—on this record. QFS insists that because Wall Street admitted its purposeful recruitment of Valhalla when it knew that Valhalla was still a QFS agent, this satisfies the element of intentional inducement. But this logic does not hold unless Wall Street was *also* aware of at least some terms of the QFS-Valhalla contract, *and* knew that its recruitment of Valhalla would likely precipitate a breach. *See Columbia Dev. Corp. v. Krohn*, 1st Dist. Hamilton No. C-130842, 2014-Ohio-5607, ¶ 20 (stating that tortious

4

interference requires "inten[t] to cause a breach of contract," not just actions that "ha[ve] the unintended effect" of procuring breach), citing Restatement of the Law 2d., Torts, Section 766, Comment h (1979). Among thousands of pages of deposition testimony and exhibits composing the trial court record, QFS fails to point us to any evidence affirmatively demonstrating Wall Street's intent to induce a breach of contract. QFS complains that allowing Wall Street to knowingly recruit its agents would "create a gaping hole in tortious interference law." Much to the contrary, allowing a tortious interference claim to proceed with absolutely no evidence of the defendant's intent to induce breach of a contract would radically expand the boundaries of the tort. Agents like Valhalla are pursued every day by multiple suitors, and even if they are under contract, none of this raises alarms unless it actually leads to a breach that the competitor knows about.

{¶10} Even if QFS could demonstrate an issue of material fact as to Wall Street's intentional procurement of a breach, its tortious interference claim trips over the next hurdle: lack of justification. "Ohio law places the burden of proving a lack of privilege or justification upon the plaintiff." *Columbia Dev. Corp.* at ¶ 25, quoting *Alexander v. Motorists Mut. Ins. Co.*, 1st Dist. Hamilton No. C-110836, 2012-Ohio-3911, ¶ 33. Moreover, Ohio has adopted Section 768 of the Restatement (2d.) of Torts, under which "fair competition may constitute a proper ground, or justification, for an interference with an existing contract that is terminable at will." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 179, 707 N.E.2d 853 (1999). Section 768 reads, in pertinent part:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or

not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:

> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement, Section 768. On appeal, QFS maintains that Wall Street cannot avail itself of the Section 768 competitive privilege because QFS's contract with Valhalla was not "at will." To support this proposition, QFS points to Sections 10 and 11 of its contract with Valhalla. Section 10 provides, in pertinent part: "In the absence of breach, this **Agreement may be terminated by any party upon thirty days written notice given to the other.**" (Emphasis in original.) Section 11 has blanks to insert a term for the agreement, which neither party completed. Without any such defined term, the provision concludes: "This Agreement may be terminated by any party for any or no reason upon at least thirty days prior written notice." QFS maintains that the 30-day notice provision means that the contract cannot be terminable at will, despite the contract's other language allowing termination for "any or no reason."

{¶11} QFS's position stands irreconcilable with settled Ohio law: the existence of a notice provision does not prevent a contract from being terminable at will. *See Charles R. Trucking, Inc. v. Internatl. Harvester Co.,* 12 Ohio St.3d 241, 244, 466 N.E.2d 883 (1984) (recognizing and enforcing a contract that "was

terminable at will by ten days' advance notice"); *Koch v. Lind*, 121 Ohio App.3d 43, 52, 698 N.E.2d 1035 (8th Dist.1997) (recognizing a contract as "terminable at will with one week's written notice required"); *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 610, 662 N.E.2d 1088 (8th Dist.1995) (characterizing a contract as "an indefinite, exclusive brokerage agreement which was terminable at will with thirty days' notice"); *Cramer v. Fairfield Med. Ctr.*, 182 Ohio App.3d 653, 2009-Ohio-3338, 914 N.E.2d 447, ¶ 51 (5th Dist.) (employment contract "terminated on the giving of a specified notice is still employment at will"). In fact, the Fifth District recently interpreted nearly identical language to that of the QFS-Valhalla contract to confirm that "the parties' agreement was essentially terminable at will, subject to a thirty-day notice." *Bridgestone Ams. Tire Operations, LLC v. Harris*, 2018-Ohio-63, 104 N.E.3d 81, ¶ 4, 23 (5th Dist.) (interpreting contract language: "At any time, and for any reason, either party may terminate this relationship upon 30 days' written notice * * *."). QFS's contract with Valhalla provides that it "may be terminated by any party for any or no reason." This is a quintessential at-will agreement, subject to the Section 768 competitive privilege.

{¶12} Attempting to circumvent this logic, QFS comes up empty in terms of case law. It makes a blanket assertion that "if [a] third person must breach an existing contract to work with the competitor, that contract is, by definition, not terminable at will." But we see no support for this proposition on the record at hand: nothing prevented Valhalla from providing the 30 days' notice and then signing up with Wall Street. Even if Valhalla breached the agreement, that does not undermine the competitive privilege afforded Wall Street by Ohio caselaw to entice Valhalla to join it. Try as it might, QFS simply cannot take this contract out of the realm of an at-will agreement.

{¶13} In conclusion, we find that QFS did not muster an issue of material fact as to the third and fourth elements of a tortious interference claim. The record contains no evidence to support Wall Street's intentional inducement of a breach, and even if it did, QFS cannot support its burden to establish a lack of competitive privilege. Our finding that two of the required elements of tortious interference are lacking obviates any need to address the issue of damages. We accordingly overrule QFS's cross-assignment of error.

III.

{¶14} Turning to Wall Street's assignment of error, it asserts that material issues of fact remain with respect to its counterclaim against QFS for unfair competition by sham litigation. To succeed on this version of unfair competition, Wall Street must prove: 1) that "the legal action is objectively baseless"; and 2) that QFS "had the subjective intent to injure [Wall Street's] ability to be competitive." *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, paragraph one of the syllabus. The trial court found both elements lacking and granted summary judgment to QFS.

{¶15} A claim is "objectively baseless" when "no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 50, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *see Leadscope* at ¶ 25. The *Leadscope* court found a misappropriation claim to be objectively baseless when, after nearly six years of discovery, the plaintiff produced an "astonishing" lack of evidence to support the existence—let alone the misappropriation—of trade secrets. *Leadscope* at ¶ 49. Faced with a record "replete with [plaintiff's] speculation, surmise, and supposition, but wholly lacking of probative evidence," *Leadscope* recognized that a fact-finder "could reasonably infer,

based on the paucity of evidence presented, that the lawsuit was objectively baseless when filed." *Id.* at ¶ 57.

{¶16} The "objectively baseless" element of Wall Street's unfair competition claim presents a close call. On the one hand, *Leadscope* establishes a high bar for an objectively baseless claim, and the trial court found that QFS *did* raise material issues of fact with regard to its breach of contract claim against Valhalla. We recognize why, after acquiring evidence that Valhalla may have breached its contract with QFS during its transition to Wall Street, QFS might wish to consider filing suit against Wall Street. QFS pleaded that that Wall Street misappropriated confidential information through Valhalla and otherwise "encourage[ed] the Wilsons to improperly end their business relationship with QFS." It is conceivable that, when this suit was filed, the whiff of smoke convinced QFS of a fire in the vicinity. This proposition is far more easily refuted through the vantage point of hindsight (although it certainly raises questions as to why QFS continued to pursue this matter on appeal).

{¶17} On the other hand, QFS's continued insistence that its contract with Valhalla was not an at-will agreement—in spite of all case law and plain contractual language to the contrary—approaches a claim in which "no reasonable litigant could realistically expect success." *Leadscope,* 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 25, quoting *Professional Real Estate Investors, Inc.*, 508 U.S. at 60, 113 S.Ct. 1920, 123 L.Ed.2d 611. Even on appeal, QFS fails to point us toward any basis in Ohio law for its proposition that a notice provision is incompatible with an at-will agreement. QFS offers no other arguments for why the Section 768 competitive privilege should not apply—and if competitive privilege applies, then QFS could never have prevailed in its tortious interference action against Wall Street.

Nor did any evidence of misappropriation or intentional inducement by Wall Street ever materialize below.

{¶18} However, we need not ultimately decide whether QFS's claim against Wall Street lacked an objective basis, because Wall Street's counterclaim fails on the second prong of *Leadscope*'s unfair competition test: subjective intent. "[T]o successfully establish an unfair competition claim based upon legal action, a party must show that the legal action is objectively baseless *and* that the opposing party had the subjective intent to injure the party's ability to be competitive." (Emphasis added.) *Leadscope* at ¶ 37. An objectively baseless claim that is brought without intent to harm competitive ability—such as through the blundering of counsel—may warrant sanctions, but it does not rise to the level of unfair competition. *See, e.g., Thomas v. Murry,* 8th Dist. Cuyahoga No. 109287, 2021-Ohio-206, ¶ 77 (" '[M]isinterpreting the state of existing law' is a valid defense against charges of 'willful' violations of Civ.R. 11. However, such negligence is potentially subject to R.C. 2323.51(A)(2)(b) regardless of whether the party or attorney otherwise acted in good faith.").

{¶19} *Leadscope* found the subjective-intent prong of unfair competition satisfied where evidence suggested that the plaintiff "monitored [the defendant] closely" in search of opportunities to litigate, interfered with the defendant's financial prospects by publicly threatening to challenge its patent, and timed its lawsuit to torpedo a critical financing deal. *Leadscope* at ¶ 61, 63, 68, and 69. In other words, to justify a finding of subjective intent, the record should reflect specific actions designed to harm a competitor through the mechanism of meritless litigation. And although direct evidence will often be wanting (unless the competitor confesses the desire to inflict harm), the circumstantial evidence should enable a

reasonable fact-finder to find compelling evidence of subject intent consistent with *Leadscope*.

{¶20}   Here, Wall Street asks us to infer subjective intent from two sources: 1) the fact that QFS sued Wall Street three times within a five-year span (including this suit); and 2) the unsupported nature of QFS's tortious interference claim. Wall Street's reliance on QFS's multiple suits against it is problematic because neither of those suits reached a judgment on the merits. Wall Street urges that QFS's voluntary dismissal of its two other suits shows that both lacked an objective basis—but the record provides no meaningful support for this claim. We can imagine near-infinite reasons why a party would agree to dismiss an initially meritorious claim, including acquiring additional information in discovery that undermines the claim, reaching a settlement agreement, or just concluding that the litigation is costing too much. Divining subjective intent to harm competitive ability merely from the existence of two prior lawsuits (on this record) would require extreme speculation on the part of the court, and we reject Wall Street's invitation to take the leap. Wall Street's hand would be stronger if it could show, for instance, that QFS was sanctioned in the other proceedings, or if it lost and simply (and improperly) repackaged its claim in a different forum. But the record certainly does not reflect anything similar to these hypotheticals.

{¶21}   With no other evidence of QFS's intent in the record, Wall Street's only remaining avenue to show subjective intent is to request that we infer it from the baseless nature of QFS's claim.   But this reasoning is circular and would risk collapsing the two *Leadscope* criteria.   Even if it were conceivable that a suit could be *so* objectively baseless to generate an inference of subjective intent to harm, the

11

objectively-baseless inquiry here is a close call—certainly not so overpowering as to trigger a finding of subjective intent.

{¶22} Besides QFS's prior lawsuits against it, Wall Street can point us to no corroborating or circumstantial evidence of QFS's intent to harm its competitive ability. *See Leadscope,* 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 58-77 (recounting extensive, "persuasive evidence" of plaintiff's subjective "intent to harm [defendant's] business"). Ironically, Wall Street's claim against QFS fails for one of the same reasons as does QFS's claim against Wall Street: on this record, neither party can make the requisite showing of intent. We therefore overrule Wall Street's single assignment of error.

IV.

{¶23} Having concluded that both parties fail to raise an issue of material fact as to key elements of their respective claims, we affirm the trial court's grants of summary judgment and overrule both assignments of error.

Judgment affirmed.

**MYERS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.